[Civ. No. 12359. Fourth Dist., Div. Two. Nov. 16, 1973.]

ROBINSON & WILSON, INC., et al., Plaintiffs and Appellants, v. VEAN STONE et al., Defendants and Appellants.

## COUNSEL

Fullerton, Morris & Yahnke and Robert V. Fullerton for Plaintiffs and Appellants.

Acret & Perrochet, Byron D. Berg and James Acret for Defendants and Appellants.

## OPINION

**TAMURA, J.**—This litigation arises out of a dispute over the interpretation of a contract for the construction of a medical building. Plaintiffs (general contractors) brought two actions against defendants (five medical doctors); one to foreclose a mechanic's lien and the other for damages for breach of contract. Defendants cross-complained against plaintiffs and their surety on the performance and materialman's bond for damages for alleged breaches by plaintiffs. Following a month-long, consolidated, non-jury trial, the court found for defendants and judgment was entered that plaintiffs take nothing on their complaint and that defendants recover from plaintiffs and their surety $36,382 plus costs on the cross-complaint. Plaintiffs appeal from the judgment and defendants cross-appeal from an order denying their motion to amend their cross-complaint to include an allegation and prayer for recovery of attorneys' fees.

The basic facts necessary to an understanding of the issues presented by this appeal may be summarized as follows:

The project was initially conceived by a real estate broker (Carl Davis) and several others. Defendants later acquired the property to be developed, retained Carl Davis as their agent, and hired architects to prepare preliminary plans for a medical building. After obtaining a conditional construction loan commitment, the architects prepared working plans for a building containing 17,580 square feet of floor space.[1] The plans contained detailed

---

[1] The loan commitment was for $515,000 of which sum $120,194 was disbursed for land acquisition, leaving $394,806 for construction.

specifications for medical suites in 7,970 square feet of floor space to be occupied by defendants but contained no interior layout or design for the balance of 9,610 square feet which defendants intended to lease to other doctors.

In October 1966 the project was let out for bids and five contractors, including plaintiff Robinson & Wilson, Inc. (R & W, Inc.), submitted bids. The bids ranged from a high of $458,572 to a low of $429,918, R & W, Inc.'s bid being $436,440. In November 1966 all bids were rejected and the owners authorized Davis to negotiate with interested bidders to explore means of reducing costs. By letter dated November 23, 1966, plaintiff R & W, Inc. submitted a proposal based upon suggested modifications of the plans and performance on a cost plus basis with a guaranteed maximum price of $394,699. Following numerous meetings between Wilson (president of R & W, Inc.), Davis, and the owners, R & W, Inc. was ultimately selected to be the general contractor for the project. The architect prepared new plans incorporating the modifications agreed upon by the parties but the modified plans, like the first, contained no interior design or layout for the 9,160 square feet.

In December 1966 the owners' attorney prepared a proposed contract on an AIA form under the terms of which R & W, Inc. would complete the work shown on the plans and specifications on a cost plus basis with a guaranteed maximum price. The lender objected to closing the loan escrow because the contract made no provision for completion of the undesigned interior area of the building. Thereafter Davis prepared a draft of a proposed addition to the contract to meet the lender's objection and took it to the owners' attorney. The attorney suggested that Davis consult with the architects for more specific itemization of the work to be covered by the proposed amendment. According to the attorney, Davis returned shortly with a redraft,[2] he (attorney) made a few changes and added it to the proposed contract as article 20. The article reads: "ARTICLE 20. COMPLETION OF UNDESIGNED INTERIORS. The total contract price includes the sum of $30,040 for the completion of the interior for portions of the building, approximately 9,610 square feet, for which work, plans and specifications will, in the future, be prepared by the architect for the tenants concerned. The Contractor will furnish all necessary labor and materials to complete and finish the said areas generally with the materials and to the standards fixed in the plans and specifications presently in existence for the other areas of the building and specifically may be required by the

---

[2]Defendants' architect denied having anything to do with the drafting of article 20.

said tenant's architect and will, accordingly, furnish, construct, and install the following items: . . ."[3]

Plaintiffs executed the contract on February 28, 1967. It provided for a guaranteed maximum cost of $394,806[4] and included article 20. In order to enable R & W, Inc. to obtain a performance and labor and material bond, plaintiff Barney Wilkerson Construction Co. executed the contract as a joint venturer with R & W, Inc.

At the time the contract was executed, the owners had no tenants for the undesigned 9,610 square feet of the building. As work on the building progressed, the owners made commitments to various doctors to lease space in the undesigned area. Between May and July 1967, specific plans for several medical suites in the undesigned area for doctor tenants were forwarded to R & W, Inc. with a request for cost estimates. Following submission of cost estimates by R & W, Inc., a dispute arose over the contractor's obligation under article 20. Basically, the contractor's position was that under article 20 the $30,040 was intended to be an allowance against the ultimate cost of the work called for by the article and the owners or their tenants were obligated to pay all costs exceeding that amount. The owners on the other hand took the position that article 20 obligated the contractor to provide within the guaranteed maximum price all work and material necessary to complete minimum basic medical suites in the undesigned portion of the building, the work and material to be comparable in quantity and quality to that specified for the designed area except for "extras" or "embellishments" which were provided to meet the special needs of defendant owners. It was further the position of the owners that if the tenants of the undesigned area required any extras, they were to pay for them.

In August 1967 the owners transmitted to R & W, Inc. plans purporting to encompass only that work which they, the owners, conceived to be

---

[3]The items listed were as follows: "a. Requisite plumbing and fixtures for the installation of four fixtures per 1,000 square feet; b. Requisite electrical wiring and fixtures; c. Acoustical ceiling board; d. Vinyl asbestos tile floor covering; e. Interiors per item No. 15 of Addendum No. 2 (within an allowance of $1 per square foot); f. Cabinets (within an allowance of $1 per square foot); g. Air conditioning ducts, registers, controls, and other necessary equipment for a complete and operable system within each tenant space; h. Finish hardware; i. All required painting; and j. One door name plate sign per suite.

"The Contractor will not be required to furnish the items mentioned in subparagraphs (a), (e) and (f) above in those portions of the building to be occupied by either a pharmacy or a medical laboratory."

[4]As a result of several change orders during progress of the work, the maximum guaranteed price was increased to $407,434.

required to be performed by plaintiffs under article 20 for $30,040. R & W, Inc. responded by offering to perform the work called for by those plans for $140,000 or less. In October 1967 the owners ordered plaintiffs off the job and thereafter had the undesigned portion completed to the specifications of their tenants through other contractors.

The court found that plaintiffs failed and refused to perform the work called for by article 20 of the contract and that the reasonable cost of that work was $84,844.[5] It also found that defendants were damaged by plaintiffs' breach in other particulars set forth below.[6]

The court found that at all times during negotiations leading up to the

---

[5]The court found the breakdown of the reasonable cost of performing article 20 work to be as follows:

| | |
|---|---|
| "Partitions and cabinets | $16,180.00 |
| "Acoustic ceiling | 5,357.00 |
| "Tile floor and base | 4,324.00 |
| "Paint | 5,180.00 |
| "Door name plates | 240.00 |
| "Plumbing and fixtures | 9,030.00 |
| "Electrical | 25,954.00 |
| "Air Conditioning | 7,135.00 |
| "Overhead and profit | 11,444.00 |
| "TOTAL | $84,844.00" |

[6]The court found that defendants were damaged by reason of inexcusable delay in the performance of the contract ($9,000), improper performance or failure to perform certain items of work ($4,314), and by failure to defend against subcontractors' liens ($9,579). The court arrived at the net damages figure of $26,382 as follows: "In view of the foregoing, the Owners are charged with the contract price as adjusted by change orders in the amount of $407,434.00, and are credited with the following amounts:

| | |
|---|---|
| "Paid to Contractors | $336,079.00 |
| "Damages for delay | 9,000.00 |
| "Backcharges for poor workmanship and lack of performance | 4,314.00 |
| "Failure to perform work required by Article 20 | 84,844.00 |
| "TOTAL | $434,237.00 |

"As a result, the cost to the Owners of completing the work required of the Contractors under the contract, plus damages sustained by the Owners for delay in completion of the project, amount to the total sum of $434,237.00, whereas, if the Contractors had performed their obligations under the contract, the cost to the Owners would have been $407,434.00, leaving a difference of $26,803.00 as damages for breach of contract, in addition to which the Owners incurred interest and attorney fee expense because of mechanics' liens recorded by the Contractors and their subcontractors in the amount of $9,579.00."

contract and at the time the contract was executed, there were no architectural plans in existence for the interior of the undesigned area and that the exact nature and scope of the improvements to be constructed by prospective tenants in the undesigned area were unknown. It found, however, that it was known "the interiors would be constructed in conformity with the plans and specifications then in existence for the designed interior areas."

The court rejected the contractor's contention that the parties orally agreed that the guaranteed maximum contract price contained an allowance of $30,040 for article 20 work and that the owners were to pay all amounts by which the cost of that work exceeded $30,040, or that such work was to be performed at a price to be later negotiated, or that the provisions of article 20 were so ambiguous and uncertain as to be unenforceable, or that the contractors "were mistaken in executing the contract."

The court found that while improvements eventually constructed in the undesigned portions of the building were more extensive and costly than comparable improvements in the designed area, the owners offered to pay plaintiff the cost of such extra work provided the contractor completed the work in the undesigned area; that the owners also offered to permit the contractors to complete the undesigned area in "strict accordance" with article 20 with work and materials comparable in quantity and quality to the designed area; that the contractors refused to perform either in "strict accordance" with article 20 for the contract price specified or as requested by the tenants for the contract price "plus the reasonable value of any extra work requested by the tenants." The court interpreted the provision in article 20 reading "[t]he contractor will furnish all necessary labor and materials to complete and finish the said areas generally with the materials and to the standards fixed in the plans and specifications presently in existence for the other areas of the building" to mean that the work and materials to be installed in the undesigned areas were "to be comparable in quantity and quality of materials and workmanship, and in every regard, to the designed areas."

### PLAINTIFFS' APPEAL

Plaintiffs' attack upon the judgment is directed against the trial court's interpretation of article 20. The attack is basically twofold: (1) That the article is not reasonably susceptible to the interpretation placed upon it

by the trial court and (2) that the article is so ambiguous and uncertain that it was unenforceable.

Preliminarily, we review certain basic principles governing the scope of appellate review of a trial court's interpretation of a written instrument. As Mr. Witkin points out, the cases generally fall into three categories: (1) Where extrinsic evidence which has been properly admitted into evidence is in conflict; (2) where no competent extrinsic evidence has been introduced and the interpretation is derived solely from the terms of the instrument; and (3) where competent extrinsic evidence has been received but is not in conflict. (6 Witkin, Cal. Procedure (2d ed. 1971) p. 4248.) ■ In the second and third categories, a reviewing court is not bound by the trial court's interpretation and must make an independent determination of the meaning of the contract. (*Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ In the first category—where competent extrinsic evidence has been introduced and the evidence is in conflict—any reasonable construction by the trial court will be upheld under the general rule of conflicting evidence. (See 6 Witkin, *supra,* p. 4249, and cases there cited.) The case at bench obviously falls within the first category.

Although the record fails to disclose strict adherence to the two-step procedure prescribed by *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], for the receipt of extrinsic evidence to explain the meaning of a written instrument, no extrinsic evidence was required in the case at bench to expose the ambiguities in article 20. Its provisions were patently ambiguous.

In order to resolve the ambiguities, the trial judge, with commendable patience, permitted the parties to introduce voluminous testimony and exhibits to prove the meaning of article 20. After hearing the evidence and listening to arguments of counsel on the limited issue of the meaning of article 20, the judge observed, understandably, that "I really think this is the worst case I have ever heard" and continued "[w]hen the case is ultimately determined, I hope that the parties will not interpret any adjudication that is ultimately made that somebody is trying to perpetrate fraud or that someone was trying to set someone up as a patsy. [¶] I don't view it in that fashion; I view it as a terrible misunderstanding." At the conclusion of the trial, however, the court found in favor of the interpretation contended for by defendants.

Although the court made no express findings as to the precise scope of the work called for by article 20, it found that the owners offered to permit the contractor to complete the work in the undesigned area "in strict accordance with article 20." This can only be construed as an implied finding that the plans submitted by the owners to the contractor in August 1967 correctly depicted the work the contractor was obligated to perform for $30,040. In short, the court accepted the interpretation contended for by defendants that within the guaranteed maximum price, the contractor was obligated to complete the undesigned area with "minimum basic medical suites" and any "extras" required by architectural plans submitted by the tenants were to be paid for by the tenants.

There was substantial evidence to support the trial court's interpretation of article 20. There was extensive testimony pertaining to discussions and correspondence between Wilson, Davis, and defendants concerning the completion of the undesigned areas. Davis and the owners testified that Wilson repeatedly represented he could furnish work and materials necessary to complete "minimum medical suites" in the undesigned area for $3.50 per square foot and that if his subcontractors were still on the job, he would be able to do it for as little as $3 per square foot. In his letter of January 5, 1967, to Davis confirming a change in the contract price to $391,883, Wilson listed among the addenda to the original bid the following:

| | |
|---|---|
| "Addition—Partitions N | 27,000.00 |
| "Addition—Partitions Finishing Empty Rooms | 3,040.00" |

Davis testified that from Wilson's letter of November 23, 1966,[7] and subsequent discussions with him, it was understood that the work to be performed in the undesigned areas was not to be confined to partitions but was to include all work necessary to complete "basic medical suites" in-

---

[7] In his letter of November 23, 1966, Wilson submitted to Davis for consideration "in accordance with our conversation the other evening with the architect and the owners" possible modifications to the plans and specifications in order to reduce costs and among the modifications suggested was the following:

"N. Leased Suites — completion of all items discussed to match existing finished suites (Base at $3.50 per square foot ~~plus or minus)~~

Special deduction from owners allowance less 50¢ for each square foot done during construction.................... ~~8,500.00~~

Add $27,000"

Davis testified the words "plus or minus" were deleted at his request and initialed by Wilson.

cluding acoustical ceilings, electrical outlets, vinyl floor coverings, basic plumbing fixtures, cabinets, and air conditioning outlets.

The owners' attorney testified that the lender objected to the initial draft of the contract because of its failure to deal with the undesigned areas for which there were no plans and specifications and that in early December Davis submitted a draft of a proposed addition to the contract to meet the lender's objections. The proposed draft, the text of which is set out in the margin below, was, according to Davis, in accordance with his understanding with Wilson.[8]

Wilson testified his reference to "partitions" in his letters to Davis meant partitions only and that the amounts set forth were merely estimates based upon a figure of $3 per square foot. He testified he furnished the estimates at Davis' request on the representation it was required to satisfy the lender, that there was no way to determine what partitions would actually cost "other than to make an estimate or allowance." He further testified it was his understanding that the $30,040 would be an allowance to go towards completion of interior partitions in the undesigned areas and that if the type of partitions actually requested by the tenants should cost more, the excess would be paid by the owners or the tenants.

It was for the trial court to resolve the conflict in the evidence. Our function is limited to a review of the record to determine whether there was substantial extrinsic evidence to support the trial court's interpretation. We conclude there was.

The crucial issue as we view it, however, is whether article 20, as interpreted by the court below, is sufficiently definite and certain to give rise to a legal obligation. For the reasons which follow, we have concluded it is not.

---

[8]Davis' draft of the proposed addition to the contract was as follows: "Contract
"a. The total price includes a sum of $27,000.00 for the specific purpose of completing the interiors of 8090 square feet* at a cost of $3.50 per square foot rounded to the nearest thousand. This work to be done as in accordance with future plans and specs prepared by the architect for the tenants. b. The total price includes a sum of $3040.00 for the specific purpose of completing the interiors of 1520 square feet** at a cost of 2.00 per square foot. No interior partitions are to be included other than those on the plans & specs. The tenants, a pharmacy and a Medical Laboratory, will furnish any partitions. This work is to be done in accordance with future plans & specifications prepared by the architect for the tenants.
"*as shown on attached plan and designated areas A.
"**as shown on attached plan and designated as areas B."

Where the meaning to be given a contract turns upon the credibility of extrinsic evidence, the interpretation found by the trier of fact is binding upon the reviewing court if there is substantial evidence to support it. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 865; *Smith* v. *Arthur D. Little, Inc.,* 276 Cal.App.2d 391, 401 [81 Cal.Rptr. 140].) ■ But the question whether the contract as interpreted by the trier of fact is sufficiently definite and certain in its essential terms to give rise to a legal obligation is a question of law. (*Hunter* v. *Sparling,* 87 Cal.App.2d 711, 721 [197 P.2d 807].) "[W]hether a certain or undisputed state of facts establishes a contract is one of law for the court . . . On the other hand, where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist, . . ." (17A C.J.S., Contracts, § 611, pp. 1224-1225.)

Consequently, we are not bound by the trial court's misplaced conclusion of law, as a finding of fact, that the provisions of article 20 are not so indefinite and uncertain that they cannot be enforced.

■ Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. (*Cal. Lettuce Growers* v. *Union Sugar Co.,* 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496]; 1 Corbin, Contracts, § 95, p. 394.) "Although the terms of a contract need not be stated in the minutest detail, it is requisite to enforceability that it must evidence a meeting of the minds upon the essential features of the agreement, and that the scope of the duty and limits of acceptable performance be at least sufficiently defined to provide a rational basis for the assessment of damages. . . ." (*Ellis* v. *Klaff,* 96 Cal.App.2d 471, 478 [216 P.2d 15].)

■ Article 20, as interpreted by the trial court, lacked certainty in several essential respects.

Absent plans and specifications, an agreement to provide labor and materials for the completion of "standard" or "minimal" medical suites is too indefinite and uncertain to evidence a meeting of the minds respecting the scope of the work or to provide an objective basis for assessment of damages.

In the instant case the owners' own architect testified that when Davis requested him to prepare plans depicting only that work the contractor

was required to perform under article 20 for $30,040, he told Davis that "I felt that the contractors were obligated to do something under Article 20, for thirty thousand dollars [*sic*], but that I wasn't sure as to what they were to perform for that price."

The owners attempted to make the scope of the work definite and certain by extrinsic evidence showing that it was understood the contractor would complete the undesigned area with medical suites comparable to those in the designed area but without the "extras" or "embellishments." What constituted "extras" or "embellishments" was as uncertain as the phrase "standard" or "minimal" medical suites. There was no uniform standard in the medical suites in the designed area to which those to be constructed in the undesigned area could be compared; specifications for suites in the designed area varied from doctor to doctor. This uncertainty is exemplified again by the testimony of the owner's architect. When the bank objected to the contract as initially drafted because it contained no provision for the completion of the undesigned area, Davis asked the architect for his estimate of the cost of completing the undesigned area with "standard" medical suites. The architect testified all he could do was to average out the square foot cost of partitions, plumbing, electrical and other work in the designed area and "just arrive at a happy medium" or a "rough estimate," saying "[y]ou cannot really pin it down and say this is a typical doctor's office. There is no such thing, because all doctors are somewhat different. So I tried to get a rough estimate." His rough estimate was $40,500.

Defendants' expert (Mr. Price), on whose testimony the court relied in assessing damages, used substantially the same approach as the owners' architect in determining the cost of performing so-called article 20 work. In calculating the cost of providing the items depicted on the plans of article 20 work as conceived by the owners, he averaged out the square foot cost of providing those items in the designed area. Based upon his testimony, the trial court found that the cost of performing article 20 work amounted to $84,000.

Accepting the trial court's interpretation of article 20, the plaintiffs agreed to do the same work for $30,040.

The wide disparity in the various estimates of the cost of completing the undesigned area reveals the uncertainty of the term "standard medical suites." It can neither form a basis for a meeting of the minds nor provide a rational objective standard for assessment of damages.

Article 20 is also uncertain in other essential respects. As interpreted

by the court, it obligated the contractor to complete the undesigned area in accordance with specifications to be provided in the future by the tenants for the guaranteed maximum contract price plus the reasonable value of any "extra" work required by the tenants. However, there was no evidence as to how the "reasonable value" of the "extras" was to be determined, whether it was to be cost plus or some other basis. Nor was there certainty as to who was to pay for the "extras." The owners testified it was understood the tenants would pay for them. However, the tenants, not being parties to the agreement, were obviously not bound by any understanding between the contractor and the owners.

Insofar as it pertained to so-called "extras" which may be required by the tenants, article 20 was in essence nothing more than a promise to agree in the future. ■ If an essential element of a promise is reserved for future agreement of the parties, the promise does not give rise to a legal obligation until the further agreement is made. (*Coleman Engineering Co* v. *North American Aviation, Inc.*, 65 Cal.2d 396, 405 [55 Cal.Rptr. 1, 420 P.2d 713]; *Ablett* v. *Clauson*, 43 Cal.2d 280, 284-285 [272 P.2d 753].) As the Idaho Supreme Court stated in *Nave* v. *McGrane*, 19 Idaho 111 [113 P. 82, 85]: "If the plans and specifications were not definite and certain as to the kinds and qualities of material to be used, the class of workmanship, etc., the time within which the building must be completed, the method of making payments and other matters, the bid to construct the building would only indicate a willingness to negotiate further in regard to the matters not specified, and its acceptance would express a like willingness, but would not bind either party. If they did not subsequently agree upon a contract, each would be without remedy against the other."

The provisions relating to specific requirements of future tenants were not merely minor aspects of article 20; they were important and essential terms of the bargain. As the court found, the improvements actually constructed in the undesigned portion of the building to satisfy the requirements of the tenants were substantially more extensive and costly than comparable improvements in the designed area. The actual cost of completing the undesigned area in accordance with the requirements of the tenants was $168,445.

Contracts pertaining to the construction of a building have been upheld despite apparent ambiguities in the terms of the contract on the theory that essential terms of a contract which may appear indefinite but which are capable of being identified and rendered certain by ex-

trinsic evidence are not uncertain and unenforceable. (See *Bohman* v. *Berg,* 54 Cal.2d 787, 794 [8 Cal.Rptr. 441, 356 P.2d 185]; *Rivers* v. *Beadle,* 183 Cal.App.2d 691, 697 [7 Cal.Rptr. 170]; *Mason* v. *Ennes,* 172 Cal.App.2d 99, 101 [342 P.2d 79], and *Bettancourt* v. *Gilroy Theatre Co., Inc.,* 120 Cal.App.2d 364, 367-368 [261 P.2d 351].) However, those cases are distinguishable from the case at bench.

In *Bohman* v. *Berg, supra,* 54 Cal.2d 787, there were detailed plans and blueprints for the "land yacht" *before* the contract was signed and the contractor testified he fully understood what was intended by each provision in the agreement and fully intended to be bound by it. More importantly, in *Berg,* unlike the instant case, the contractor completed performance without objecting that the terms of the contract were too indefinite to be enforced. In upholding the contract, the Supreme Court relied upon the proposition that performance without objection will render enforceable a contract which at its inception appears to be uncertain, noting that it is a cardinal rule of contract interpretation that the practical construction placed upon an ambiguous or uncertain provision before any controversy arises is one of the most reliable means of ascertaining the intention of the parties. (*Bohman* v. *Berg, supra,* 54 Cal.2d 787, 795; see 1 Corbin, Contracts, *supra,* § 29, p. 93.)

In the present case there was no performance under article 20. The disagreement arose after the plaintiff submitted cost estimates for work shown on plans for medical suites for several tenants. Davis requested that the estimates "be resubmitted in accordance with paragraph twenty (20) [article 20] of the contract." Wilson replied he did not understand Davis' letter and requested clarification. It was only then that defendants had their architect prepare plans of what they conceived to be the scope of the work to be performed by the contractor under article 20 for $30,040. The evidence was uncontradicted, however, that the plans were not intended as working plans but were merely "exhibits." By that time defendants had commitments with tenants and detailed working plans had been prepared for the completion of the undesigned area in accordance with their requirements. The uncertainties and ambiguities in the contract were never cured by subsequent conduct of the parties.

In *Rivers* v. *Beadle, supra,* 183 Cal.App.2d 691, the standard was "the type, materials and range of price of speculative homes in the general area." (*Rivers* v. *Beadle, supra,* 183 Cal.App.2d 691, 698.) The court said: "While the description might be considered too vague were this a contract

of purchase of a house or houses, it is not too vague for the purpose intended [to enable a real estate broker to obtain a commission on the sale of the houses]." (*Rivers* v. *Beadle, supra,* 183 Cal.App.2d 691, 698.)

*Mason* v. *Ennes, supra,* 172 Cal.App.2d 99, concerned a covenant to construct a building on leased property. The court found that the description was sufficiently definite to form the predicate for an action for damages where the dimensions were approximated at 30 feet by 70 feet, the wall and roof materials were specified, the building was to conform to the requirements of the building code, and it was to be of a type that would accommodate a trucking business. Unlike the instant case, cost was not an element of the covenant, nor was it an element in the contract involved in *Bettancourt* v. *Gilroy Theatre Co., Inc., supra,* 120 Cal.App.2d 364. That element would make those cases distinguishable.

We conclude that article 20 was too uncertain in essential respects to give rise to an enforceable legal obligation.

CROSS-APPEAL

Defendants appeal from an order denying their motion to amend their cross-complaint to include an allegation and prayer for recovery of attorneys' fees.

The motion, which was made approximately six months before commencement of trial,[9] sought to amend the first cause of action of the cross-complaint by adding the following paragraphs: "1. Said contract provides that if the contractor should refuse or fail to perform or make prompt payment to subcontractors, the contractors shall pay the cross-complainant's expenses incurred which exceed the contract sum and that expenses include compensation for managerial and administrative services. 2. As a proximate result of the contractor's refusal and failure to perform all duties of said contract, cross-complainants were forced to incur expenses to obtain legal services from Walker, Sullivan, Hews and Brown and Acret & Perrochet and incurred managerial and administrative expenses in completing the project and in defending cross-complainants against the action brought by the contractors and in prosecuting an action

---

[9]The original cross-complaint was filed on February 19, 1968, almost three years prior to the date of the motion.

by the cross-complainants against the contractors for breach of said contract."

It also sought to add the following to the prayer: "1. Against Robinson & Wilson, Inc. and Barney Wilkerson Construction Co., a joint venture composed of Robinson & Wilson, Inc., a corporation, and Barney Wilkerson Construction Co., a corporation and Transamerica Insurance Company, for reasonable attorney's fees incurred according to proof and for managerial and administrative services incurred according to proof in completing the project and in prosecuting this cross-complaint and in defending the action brought against cross-complainants by these defendants."

The memorandum of authorities in support of the motion to amend based the claim of attorneys' fees incurred in defending and prosecuting the action on article 22[10] of the contract which read: "OWNER'S RIGHT TO TERMINATE CONTRACT If the Contractor should be adjudged a bankrupt, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed on account of his insolvency, or if he should persistently or repeatedly refuse or should fail, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper materials, or if he should fail to make prompt payment to subcontractors or for material or labor, or persistently disregard laws, ordinances or the instructions of the Architect, or otherwise be guilty of a substantial violation of any provision of the Contract, then the Owner, upon the certificate of the Architect that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy and after giving the Contractor, and his surety if any, seven days' written notice, terminate the employment of the Contractor and take possession of the premises and of all materials,

---

[10]For the first time on appeal defendants cite article 32 of the contract as an additional basis for claiming attorneys' fees incurred in this litigation. Article 32 read: "LIENS [¶] Neither the final payment nor any part of the retained percentage shall become due until the Contractor, if required, shall deliver to the Owner a complete release of all liens arising out of the Contract, or receipts in full in lieu thereof and, if required in either case, an affidavit that so far as he has knowledge or information the releases and receipts include all the labor and material for which a lien could be filed; but the Contractor may, if any subcontractor refuses to furnish a release or receipt in full, furnish a bond satisfactory to the Owner, to indemnify him against any lien. If any lien remains unsatisfied after all payments are made, the Contractor shall refund to the Owner all moneys that the latter may be compelled to pay in discharging such a lien, including all costs and a reasonable attorney's fee." Since the motion was not based on the foregoing provision, it may not be raised for the first time on appeal. Moreover, it is not applicable to attorneys' fees in the instant litigation.

tools and appliances thereon and finish the work by whatever method he may deem expedient. In such case the Contractor shall not be entitled to receive any further payment until the work is finished. If the unpaid balance of the Contract Sum shall exceed the expense of finishing the work including compensation for additional architectural, managerial and administrative services, such excess shall be paid to the Contractor. If such expense shall exceed such unpaid balance, the Contractor shall pay the difference to the Owner. The expense incurred by the Owner as herein provided, and the damage incurred through the Contractor's default, shall be certified by the Architect."

While cases are legion holding that trial courts should exercise great liberality in permitting amendments to pleadings in order that cases may be tried on their merits (e.g., *Desny* v. *Wilder,* 46 Cal.2d 715, 751-752 [299 P.2d 257]; *Cardenas* v. *Ellston,* 259 Cal.App.2d 232, 238 [66 Cal.Rptr. 128]; *Simons* v. *County of Kern,* 234 Cal.App.2d 362, 367-368 [44 Cal.Rptr. 338]), a reviewing court will not disturb the trial court's action unless the record shows a manifest abuse of discretion (*Dos Pueblos Ranch & Imp. Co.* v. *Ellis,* 8 Cal.2d 617, 622 [67 P.2d 340]; *Permalab-Metalab Equipment Corp.* v. *Maryland Cas. Co.,* 25 Cal.App.3d 465, 472 [102 Cal.Rptr. 26]). The right to amend a pleading should be denied if it appears to a certainty that no relief could possibly be granted under the amended pleading. (*Bernstein* v. *Financial Indem. Co.,* 263 Cal. App.2d 324, 328 [69 Cal.Rptr. 543]; see *Landis* v. *Superior Court,* 232 Cal.App.2d 548, 554 [42 Cal.Rptr. 893]; *Daum* v. *Superior Court,* 228 Cal. App.2d 283, 286 [39 Cal.Rptr. 443]; 3 Witkin, Cal. Procedure (2d ed. 1971) § 1045, p. 2622.)

In the present case an award of attorneys' fees for defending the principal action or prosecuting the cross-complaint could not have been awarded under the allegations of the proposed amendments. It is settled that unless there are pleading and proof of an express contractual provision therefor, attorneys' fees cannot be awarded a successful litigant. (*Genis* v. *Krasne,* 47 Cal.2d 241, 246 [302 P.2d 289]; *Arnold* v. *Browne,* 27 Cal.App.3d 386, 398 [103 Cal.Rptr. 775].)

Defendants contend the words "managerial and administrative services" in article 22 may be interpreted to encompass attorneys' fees incurred in litigation.[11] In the context in which the words are used, they

---

[11]Defendants' argument appears to be confined to a claim of attorneys' fees incurred in the instant litigation. It is to be noted that the trial court awarded defendants attorneys' fees incurred in defending against subcontractors' liens as part of the damages.

cannot be so construed. Expenses incurred by the owners in "finishing the work" cannot be construed to include attorney's fees incurred in a suit for damages for breach of contract. Furthermore, as plaintiffs point out, owners' rights under article 22 are predicated on an architect's certificate, but the proposed amendment fails to allege that such a certificate has been obtained. In their closing brief, defendants fail to respond to that point.

Defendants cite *Jen-Mar Constr. Co.* v. *Brown,* 247 Cal.App.2d 564 [55 Cal.Rptr. 832], in support of their position that attorneys' fees incurred in litigation are recoverable under the contract provision in question. Reliance upon *Jen-Mar* is misplaced. The contract clause there provided: " '. . . To pay for any *expense* the Contractor or any other sub-contractor may suffer as a result of the Sub-Contractor's failure through causes within said Sub-Contractor's control to carry out the provision[s] [*sic*] of this agreement.' " (Original italics.) (*Jen-Mar Constr. Co.* v. *Brown, supra,* 247 Cal.App.2d 564, 572.) The court held the clause impliedly encompassed payment of litigation expenses. The instant contract clause is limited to expenses of "finishing the work." *Ecco-Phoenix Electric Corp.* v. *Howard J. White, Inc.,* 1 Cal.3d 266 [81 Cal.Rptr. 849, 461 P.2d 33], cited by defendants is equally inapposite. The case involved the interpretation of a clause reading in part: " '*Should litigation be necessary* to enforce any term or provision of this agreement, then all litigation and court costs and reasonable attorney's fees shall be borne wholly by the Sub-Contractor.' " (Original italics.) (*Ecco-Phoenix Electric Corp* v. *Howard J. White, Inc., supra,* 1 Cal.3d 266, 272.) The Supreme Court simply held that a reasonable interpretation of the clause was that the subcontractor would be liable for costs and attorneys' fees only if it (the subcontractor) made "litigation" necessary.

For the first time in their closing brief, defendants assert they are entitled to recovery of attorneys' fees on the theory their cross-complaint pleaded a cause of action in tort as well as breach of contract and that attorneys' fees are recoverable under their tort cause of action. Apart from the fact that a contention raised for the first time in a closing brief may be disregarded, defendants' motion was specifically directed to an amendment of the breach of contract cause of action of their cross-complaint.

The order denying the motion to amend the cross-complaint will be affirmed.

DISPOSITION

Plaintiffs' appeal: The judgment is reversed with directions to make new findings and conclusions consistent with this opinion and to enter judgment accordingly.

Defendants' appeal: The order denying motion to amend the cross-complaint is affirmed.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied December 6, 1973, and the petition of the defendants and appellants for a hearing by the Supreme Court was denied January 31, 1974.