Filed 12/6/23  ACR Services v. LSM Group CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ACR SERVICES, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LSM GROUP, INC., <br><br> Defendant and Appellant. | D082256 <br><br><br> (Super. Ct. No. CIVRS1303806 ) |

APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed.

Clapp Moroney Vucinich Beeman & Scheley, Adrianne C. Duncan, Austin R. Wallick, and Christopher J. Beeman, for Defendant and Appellant.

Law Office of Thomas W. Sardoni, Thomas W. Sardoni, Daniel L. Schnebly, and Nathan T. W. Sardoni, for Plaintiffs and Respondents.

ACR Services, Inc. (ACR) provided emergency services and materials in response to a water leak at a restaurant operated by LSM Group, Inc. (LSM). However, LSM refused to pay ACR for its services.  ACR therefore sued LSM for breach of contract, quantum meruit, a common count (work, labor, services, and materials), and unjust enrichment.

The dispute proceeded to a bench trial on the first three causes of action, and the trial court found in favor of ACR in the amount of $104,647.01 plus prejudgment interest, costs, and attorney fees. LSM appeals, contending that the trial court erred in finding a valid contract between the parties. In addition, LSM argues the two-year statute of limitation for equitable claims not based on a written contract had expired. As such, LSM maintains the trial court erred in finding in favor of ACR and awarding it any damages.

We disagree with LSM's contentions; thus, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Trial Evidence*[1]

In 2009, LSM operated a pizza restaurant, Pizza Di Mario, located on Haven Avenue in Rancho Cucamonga. Pizza Di Mario operated in a commercial building, and it shared a wall with a karate studio that operated out of the suite next door. At that time, Lynnette Samson was the principal owner of LSM. On February 15, 2009, the Rancho Cucamonga Fire Department called Samson to inform her that it was responding to a water leak at Pizza Di Mario. The water leak emanated from a loose water hose connected to an ice machine in that restaurant.[2]

---

[1] We recount the facts in the light most favorable to the verdict. (See *Sacramento Sikh Society Bradshaw Temple v. Tatla* (2013) 219 Cal.App.4th 1224, 1227.)

[2] Although a water leak caused by a loose water hose to an ice maker may sound minor, the damage caused here was anything but. Despite not being thoroughly explained in the briefs, the loose water hose apparently allowed water to spill across Pizza Di Mario and overwhelm the floor drains, which backed up, causing the entire property to flood. Some of that water was contaminated with harmful bacteria.

When Samson arrived at Pizza Di Mario on February 15, a crew from the fire department was there, "cleaning up [and] draining the floors." Samson stated that the fire chief told her "to clean up, sanitize the pizza and he'll come back in the evening to inspect." Samson and another employee cleaned Pizza Di Mario the rest of the day and met with a representative of the fire department that evening. According to Samson, the representative told her that she just needed "to contact the health department and [she] [could] actually open right there." However, Samson did not open the restaurant that evening. Instead, she decided to open it the next day.

ACR is a licensed contractor providing emergency water, sewage, and fire remediation for commercial and residential real properties. Brandt Benson[3] is the chief executive officer of ACR. On February 16, 2009, Knicko Askari called Brandt requesting that ACR come to Pizza Di Mario because the property had suffered "sewage damage" and "had been red tagged by the fire department." Askari had been contacted by the property manager and served as "a project coordinator."

When Brandt arrived at Pizza Di Mario, he reviewed a closure order for the business issued by the Rancho Cucamonga Fire Department. The closure order called for sanitizing all surfaces, discarding any exposed food packaging that was unsealed, obtaining San Bernardino Health Department approval, clearing floor drains, and removing water from floor areas. All five of these tasks were required to be completed before the business could reopen.

Brandt could smell the sewage when he entered Pizza Di Mario. There, he approached Samson, who had arrived at the property. He told her that "based on where everything ha[d] gotten wet, . . . the karate studio was

---

[3] Because Brandt Benson's brother Michael testified at trial, we refer to Brandt and Michael by their respective first names.

3

affected as well, . . . [and] the walls around the perimeter were being affected by sewage." Brandt further informed Samson that he needed "to look at all the property, then come back and have a quick conversation . . . about what needs to be happening."

After further inspecting the property, Brandt told Samson that a certified hygienist was required to determine whether the water was contaminated, which would impact the scope of the cleanup of the property. In addition, Brandt informed Samson that they needed to talk with the insurance adjuster. Despite the need for additional information regarding the scope of the necessary work, Brandt and Samson signed a written Emergency Services Agreement (ESA).[4] The ESA listed the address of Pizza Di Mario and referenced Askari as the project coordinator.[5] According to Brandt, the ESA "has basic rates and so forth that are established in the service call, right down to the equipment." However, Brandt admitted that several sections of the ESA were not filled out. Brandt explained that the sections were left blank because, at the time it was executed, the project was "going day by day. It was a time and materials job once it was established with the adjuster and the hygienist."

The ESA also included an attachment, which contained rates (e.g., service call $158.91, labor $56.75) that were based on rates from Xactimate, a billing software commonly used by insurance companies. Further, Brandt

---

[4] The ESA was an exhibit at trial. However, the trial exhibits are not part of the record. Although this case concerns the validity of the ESA, surprisingly, neither party cites directly to it in any of the briefs. In other words, the parties have not indicated where the ESA exists in the record.

[5] The owner of the karate studio also signed an emergency services agreement.

4

informed Samson that billing for the project would "be produced on . . . Xactimate."

On the day the ESA was executed, Brandt also told Samson that, "on the first day," "all we're going to do is treat the areas, disinfect them, put some equipment to stabilize the air, and . . . extract what we can as far as the free water or free sewage that's floating around the property."

Brandt also discussed with Samson the need to clean up the neighboring karate studio that had been damaged by the water leak at Pizza Di Mario. And he informed her that they would meet with the hygienist and insurance adjuster the following day.

According to Brandt, the hygienist's report would determine the scope of the work. As such, he told Samson:

> "[W]e needed to have a certified hygienist to be able to do testing to determine what the damages are, then the scope or the protocol he would establish to tell us as the emergency service company what we will be removing, how we are cleaning, to get to a clearance so that we can get this ready for San Bernardino County Health Department to give us a final go ahead. You can reopen the food establishment. You can reopen the dojo, whatever, so people won't get affected or get hurt by the contaminants that were left."

After Brandt and Samson discussed and executed the ESA, Brandt contacted ACR's office to have a crew come to the property. In addition, Brandt reached out to three hygienist companies, and one such hygienist, Robert Menald (president of Titan Environmental, Incorporated (Titan)), provided a preliminary protocol over the phone so ACR could start the cleanup. Thus, ACR extracted floors, disinfected, and set up dehumidification and air scrubbing to "stabilize the air" as well as the building.

5

The next day, on the morning of February 17, 2009, Brandt and Samson met at Pizza Di Mario along with Terri Warde (the insurance adjuster), the property manager, and Menald. The group discussed the amount of damages and affected areas at the property as well as what would be required to properly remediate the property after Menald provided a laboratory report evaluating the water. As such, the scope of the work ACR was to perform was deliberated, and Brandt claimed that he followed the proposed scope. Further, it was agreed that Menald would go forward with the testing and return with a protocol to remediate the property so that the health department would allow it to reopen.

Titan prepared a report based on samples of the water at Pizza Di Mario and the karate studio. The report indicated that the property suffered a "Category 3 water loss," which means the water contained certain bacteria, like coliform, E. coli, and Enterococci, and sat for over 48 hours. Although the report was dated February 23, 2009, Menald verbally communicated the suggested protocol to Brandt, Samson, and Warde on February 17, 2009.[6] In addition, Menald indicated that he met with Samson and she (along with the insurance adjuster) authorized Titan's testing of the property.

ACR completed its work on February 27, 2009. Because it was retained only to perform the remediation and cleanup of the property, ACR did not rebuild any portion of it. The health department provided clearance for the

---

[6] The protocol involved removing any porous or semiporous materials, cleaning the area, vacuuming the area, wiping the area with antimicrobial and antibacterial wet wipes, utilizing solvent type cleaners, and drying all the wet substrates. In performing the remediation work, the crew would continue until it reached a clean area, which would indicate no further water stain, fungal growth, bacteria, or moisture. Additionally, the workers at the site were required to wear personal protective material, including gloves, coveralls, and respiratory protection.

property to reopen, which required remediation of both Pizza Di Mario and the karate studio. Ultimately, ACR billed $44,892.22 for its work at Pizza Di Mario and $33,696 for its work at the karate studio. In addition, as part of the agreed work at the property, a subcontractor, Inland Tri Tech, performed "the build back, restoration work after remediation was completed and clearances were achieved." Inland Tri Tech billed a total of $26,058.79, and ACR paid Inland Tri Tech directly. Inland Tri Tech then assigned its claim to ACR.

Michael Benson, the chief financial officer of ACR, testified that ACR sent invoices directly to the insurance carrier as the carrier instructed. This arrangement allowed ACR to discuss with the insurance adjuster any issues with the bill, make appropriate adjustments, and get the invoices processed timely. Michael stated that he typically provided documentation to the business owner. He further indicated that Samson never instructed him to handle invoices differently.

Michael explained, in instances where ACR is providing emergency services, the company does not provide a bid. Rather, ACR indicates what equipment is going to be needed, but it does not know, in the beginning, how long a particular job will take. As such, ACR typically bills the insurance company while documenting the services provided through labor logs, material logs, and equipment logs. Also, ACR would provide pictures of the site and the work performed.

Michael stated that ACR never received any payment for the three invoices related to the remediation project at Pizza Di Mario.

### Statement of Decision

After the conclusion of trial and further briefing from the parties, the trial court issued a statement of decision. There, the court determined the

evidence sufficient to establish "all the elements of an enforceable contract were formed based on the parties' written Emergency Services Agreement and supplemental oral terms." To support its finding, the court credited Brandt's testimony that he explained to Samson that Pizza Di Mario and the karate studio would both need to be sanitized and a certified hygienist would need to prepare the applicable protocol.

The court also found credible Brandt's testimony that Brandt informed Samson that not all the terms of the ESA could be completed until the hygienist performed environmental sampling and prepared the protocol. The court further observed that Brandt and Samson conducted a walkthrough of the property with Menald and Warde and that Brandt explained to Samson that the total cost of ACR's services would be determined by the scope of necessary work set forth in the protocol as well as rates set by Xactimate.

The court also found LSM was liable for the cost to cleanup and remediate the karate studio. To this end, the court relied upon Brandt's testimony that he told Samson remediation would be required at the karate studio, the flooding was caused by a loose water hose at Pizza Di Mario, and the standard of care required cleanup of the entire affected area (which included the karate studio).

Additionally, the court determined that ACR's claims for quantum meruit and a common count were not barred by the two-year statute of limitations because the evidence at trial established that "ACR provided valuable emergency services and materials for LSM's benefit, at LSM's request, in reliance on Ms. Samson's signing of the February 16, 2009 Emergency Services Agreement."

8

Finally, the court found that the assignment of rights between ACR and Inland Tri Tech was valid and enforceable.[7]

## DISCUSSION

Here, LSM raises three issues. First, it claims the trial court erred in determining that a valid contract existed between ACR and LSM. Second, LSM argues it was not a party to any contract between ACR and the karate studio; thus, the trial court erred in awarding damages to ACR for LSM's failure to pay for services provided to the karate studio. Finally, LSM contends the two year statute of limitations precludes ACR's equitable claims.

A. Legal Principles and Standard of Review

Here, LSM implores us to apply a de novo standard of review to address a "pure error of law." To this end, it argues the issues before us "rely entirely on the interpretation of statutes and case law." Yet, we note that LSM claims that no valid contract exists, and the trial court erred in finding otherwise.

Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But whether the material facts are certain or undisputed, the existence of a contract is a question for the court to decide. (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407 (*Robinson & Wilson*).) Below, the court considered conflicting evidence, made findings of fact, and found a contract existed between ACR and LSM. As to that issue, considering the record before us, we would review

_____

[7] Because LSM does not challenge this finding on appeal, we do not discuss the evidence upon which the court relied to support its conclusion.

9

the trial court's factual findings under the substantial evidence standard. (Cf. *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364 (*Foreman*).) Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613 (*Gevorgian*).)

A single witness's testimony may constitute substantial evidence to support a finding. (*Gevorgian, supra*, 218 Cal.App.4th at p. 613.) It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. (*Foreman, supra*, 144 Cal.App.4th at p. 365.)

However, LSM also claims that any contract between ACR and LSM is not sufficiently definite to be enforceable. Therefore, it argues the ESA lacked sufficient material terms to allow LSM to understand what it was agreeing to. Whether a contract is sufficiently definite to be enforceable is a question of law. (See *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 209; *Hunter v. Sparling* (1948) 87 Cal.App.2d 711, 721.)

In addition, as to other claims of error, we are reviewing a judgment following a bench trial wherein the court issued a statement of decision. Accordingly, we review questions of law de novo (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765) and apply a substantial evidence standard of review to the trial court's findings of fact (*Foreman, supra*, 144 Cal.App.4th at p. 364).

B. Analysis

Here, LSM argues the trial court erred in finding a valid contract existed between the parties. Subsumed in this argument is LSM's assertion that the subject contract's terms are too indefinite to be enforceable. And

10

critical to LSM's position here is its contention that the ESA is the complete contract: "The single page that was signed by [Samson] constitutes the entirety of any agreement between the parties." Yet, that conclusion is belied by the explicit findings of the trial court as set forth in the statement of decision. Moreover, the court made specific factual findings that LSM largely ignores. As we explain *post*, LSM's singular focus on the ESA hinders its ability to show error below.

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; accord *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*); *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*) [" 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' "].) "[T]he burden is on appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson*, at p. 609; see *Denham*, at p. 564.) Additionally, "[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.)

With LSM's reliance on the ESA, we would expect that LSM would, at the very least, cite to that agreement in the record and then review the terms (or lack thereof) in detail to persuade us the parties did not enter into a valid contract. This is especially true because the ESA was an exhibit at trial. Nonetheless, LSM does not cite to the ESA. Instead, LSM refers to witness testimony about the ESA's terms. Although the testimony suggests that the

11

ESA was a form agreement that contained a lot of blanks that were not filled out at the time it was executed, we note there was testimony that the ESA contained certain terms, such as the hourly rates of a service call, labor, and trucks as well as the cost per day of certain equipment.[8]

That said, we understand that Samson testified there were no attachments to the ESA and the ESA itself did not provide for the scope of ACR's proposed work. But the trial court did not find this omission fatal to ACR's claim. Rather, it determined that an enforceable contract was formed based on the ESA and "supplemental oral terms." These supplemental oral terms were described by Brandt at trial wherein he testified that he informed Samson that some of the terms of the ESA could not be completed until the hygienist performed environmental sampling and prepared a protocol, and the scope of work would be determined based on that protocol, billed on rates set by Xactimate. Brandt further told Samson what work would be conducted on the first day (February 16), and Samson walked through the property with Brandt, Menald, and Warde to assess the damages and discuss what needed to be done to reopen Pizza Di Mario. Indeed, the statement of decision cited to this evidence in finding a valid contract existed between ACR and LSM. And a written contract may have its terms explained or supplemented by "evidence of consistent additional terms" and/or "course of dealing or usage of

---

[8]    We have independently reviewed the record and found a document that appears to be the ESA. It is part of several documents attached to a declaration filed in support of LSM's motion for summary judgment. But the subject declaration simply refers to this collection of documents as "copies of excerpts from [ACR's] responses to [LSM's] Request for Production, Set One." Although we cannot be sure that the document we found in reviewing the record is the same ESA that the parties offered as an exhibit at trial, the document appears to be consistent with the trial testimony describing the ESA. Additionally, it is signed by Samson, authorizing ACR to "perform the emergency services described in this document and its attachments."

trade or by course of performance." (See Code Civ. Proc., § 1856, subds. (b) & (c).) Therefore, we find no error simply based on the trial court's reliance on evidence showing that the parties agreed to additional terms orally.[9]

Additionally, LSM's appeal here is undermined because it did not address the evidence upon which the court relied. Instead, the statement of facts in the opening brief primarily consist of Samson's testimony and her version of events (namely, she was not told anything about the scope of the work to be performed at the property). LSM makes no mention of the evidence on which the court relied to find a valid contract between the parties.[10]

---

[9]     LSM does not advance any arguments that the ESA could not be supplemented by oral agreement or course of dealing of the parties. For example, it does not argue that the ESA contained an integration clause indicating that the ESA was the complete and exclusive statement of the terms of the agreement. (See Code. Civ. Proc., § 1856, subd. (b).) To the contrary, Brandt testified at trial that the parties did not intend the ESA to contain all the terms of the agreement between the parties. And LSM concedes this point in the opening brief.

[10]     This is improper. An appellant's opening brief "must . . . [p]rovide a summary of the significant facts limited to matters in the record" (Cal. Rules of Court, rule 8.204(a)(2)(C)) and must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears" (*id.* at rule 8.204(a)(1)(C); *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 29 ["It is axiomatic that an appellant must support all statements of fact in his briefs with citations to the record . . . ."]). These burdens placed on the appellant are logical in that it is not our role to scour the record in search of the appellant's arguments. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534 ["It is not our place to comb the record seeking support for assertions parties fail to substantiate"];

13

Further, to the extent LSM acknowledged ACR's trial evidence, it summarily dismissed it as lacking specifics and argued the trial court simply ignored Samson's testimony. In so arguing, LSM glosses over the trial court's role below, as the trier of fact, to determine the credibility of witnesses. Clearly, the court did not find Samson credible as it disregarded most of her testimony and agreed with Brandt.[11] On appeal, we cannot reweigh the evidence. (*Foreman*, *supra*, 144 Cal.App.4th at p. 365.)

Simply put, we determine LSM has not carried its burden here to show prejudicial error as to the court's finding that a contract existed. It has not discussed or addressed the proper standard of review. (See *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 [concluding the failure to articulate the standard of review on appeal is potentially a fatal omission].) LSM did not cite to or sufficiently analyze the terms of the challenged contract. And LSM failed to adequately address the evidence on which the court relied to find a valid contract.

---

*City of Lomita v. City of Torrance* (1983) 148 Cal.App.3d 1062, 1069 [" 'It is neither practical nor appropriate for [a reviewing court] to comb the record on [an appellant's] behalf' "].)

[11]    Samson's trial testimony painted a very different picture of what occurred at the property. For example, Samson testified that when she arrived at Pizza Di Mario on February 16, 2009, "many people [were] inside with mask[s]." She described the scene as "[e]verything in shamble[s], all the walls were cut up." Regarding the execution of the ESA, she said that she signed the agreement because people were "tearing up [her] place." Samson claimed that no one told her what was going on or what was required to remediate Pizza Di Mario so it could reopen. However, on cross-examination, Samson admitted that she had talked to Warde, the insurance adjuster, about what was occurring at Pizza Di Mario and the karate studio. She further admitted that she was provided a claim number by her insurance company related to the water damage. Additionally, Samson acknowledged that she believed her insurance adjuster was handling the claim for her.

Further, our analysis does not change if we consider *Gateway Rehab and Wellness Center, Inc. v. Aenta Health of California, Inc.* (C.D. Cal., Apr. 10, 2013, No. SACV 13-0087-DOC (MLGx)) 2013 WL 1518240 as LSM urges us to do. That case concerned a motion to dismiss in federal court involving allegations of an implied contract. It is not analogous to the situation before us.

Similarly, we are not persuaded by LSM's argument that the law does not allow one party to a contract to unilaterally modify the terms with after the fact notification to the other party. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 791.) The trial court did not find that ACR unilaterally changed any terms. To the contrary, it concluded that the parties orally discussed the scope of the contract and what needed to be done to remediate and reopen Pizza Di Mario.

Having concluded that substantial evidence supports the trial court's finding that a contract between ACR and LSM actually existed, we next turn to LSM's argument that the terms of that contract were too uncertain to be enforced.

"Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 623.) "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770; *Robinson & Wilson*, *supra*, 35 Cal.App.3d at p. 407.) "Where a contract is so uncertain and indefinite that the intention of the parties in material

15

particulars cannot be ascertained, the contract is void and unenforceable." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481; Civ. Code, § 1598; see *Ladas*, at p. 770.) "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." (Rest.2d Contracts, § 33, subd. (2); accord, *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) But "[i]f . . . a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." (*Weddington*, at p. 811.)

Below, the trial court determined that the terms of the contract were sufficiently certain to be enforced. Simply because we are reviewing that conclusion de novo does not mean that we shall scour the record for LSM's benefit or that LSM is otherwise relieved of its responsibility to affirmatively demonstrate error. (Cf. *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372.) Here, once again, LSM has not carried its burden.

"The cases make clear that the specificity required for an enforceable contract depends on the circumstances." (*S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.*, (1976) 58 Cal.App.3d 173, 182; see, e.g., *Coleman Engineering Co. v. North American Aviation, Inc.* (1966) 65 Cal.2d 396, 405-406, 417 [finding contract enforceable despite the dissent's assertion that neither design specifications, price, nor time of performance had been agreed on and the parties' negotiations demonstrated that they deemed both the specifications and price to be essential]; *Bettancourt v. Gilroy Theatre Co.* (1953) 120 Cal.App.2d 364, 369 [finding a contract to build a "First class Theatre" sufficiently definite and certain to create and impose a contractual obligation because the expression "first class theatre" enabled the defendant

16

"to know what it had undertaken to do"]; *Mason v. Ennes* (1959) 172 Cal.App.2d 99, 100-101 [concluding contract enforceable that involved the construction of building 30 by 70 feet in which the materials were specified, the building was to conform to the local building code requirements and could accommodate a trucking business].)  Often, courts must imply and interpret to deal with ambiguities and omissions.  (See *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 852.)  " '[T]he modern trend of the law favors carrying out the parties' intention through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty.'  [Citation.]" (*Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1065.)

Here, ACR was brought in to handle an emergency situation— a leak that had flooded Pizza Di Mario and the karate studio next door.  Thus, ACR moved quickly to remediate and clean the property.  It is undisputed that the ESA did not contain all the terms of the agreement between the parties. Indeed, the final terms of the agreement were not known at the time that the parties executed the ESA.  Further, the objective of both ACR and LSM in entering into a contract was to clean up and remediate the property so that Pizza Di Mario could reopen.

As Brandt explained to Samson, a protocol following a test of the water was necessary to determine the scope of the required work.  Moreover, the court found that the terms of the ESA were supplemented based on the evidence that Brandt told Samson what needed to be done, Samson was involved in discussions regarding the scope of the work, Samson was informed how the work would be billed, Samson approved Titan's environmental testing, and Samson was privy to and did not object to Titan's recommended protocol.  Also, Samson was present at the property most of the

17

days on which ACR was working, and she admitted that she took no action to remove ACR during the 11 days its workers were cleaning the property.[12]

Here, LSM does not address this evidence. Rather, it offers only its narrative of events that Samson, as LSM's principal, was uninformed about the scope of the work at the property and received no invoices or change orders related to the work at the property.[13] LSM urges us only to consider a single page of the ESA as the entire agreement of the parties. Yet, by ignoring the evidence relied on by the trial court that Samson was both informed about and involved in creating the scope of work necessary to cleanup Pizza Di Mario, LSM has not carried its burden of showing the trial court erred in concluding the contract was sufficiently certain so that it was enforceable.

Similarly, we are not persuaded by LSM's argument that the court erred in finding LSM was responsible for the costs of cleaning up the karate studio. Specifically, LSM contends the emergency services agreement between ACR and the karate studio cannot bind LSM because LSM is not a signatory to that agreement and that contract has the same deficiencies as the ESA. However, the court did not find LSM responsible to pay the costs to

---

[12]    However, Samson's trial testimony was somewhat confusing on this point. Although she admitted that she did not attempt to stop ACR from performing work at the property, she nevertheless testified that she fired the people working on her property at some point. Samson also stated that she hired another contractor to repair the property, but she failed to provide any details regarding the amount she paid the contractor. And she admitted that the company she claimed to have hired did not perform any cleanup or remediation services at Pizza Di Mario.

[13]    At trial, Samson did admit that her insurance adjuster provided her with documentation that it had paid Titan in connection with the remediation work.

18

remediate the karate studio based on LSM being a party to the contract between ACR and the karate studio. Rather, the court found LSM liable because the karate studio was damaged by the leak at Pizza Di Mario.

To this end, the court emphasized that when Samson executed the ESA on behalf of LSM, Brandt explained to her that "based on the odor and visual evidence of sewage throughout the property, and based on the fact that the flooding which originated in Pizza Di Mario also extended to the karate studio next door, the restaurant and karate studio would both need to be sanitized and a certified hygienist would need to prepare a protocol for the sanitation process." Further, the court noted that LSM stipulated at trial that "the flooding was caused by a loose rubber hose that came loose from the ice machine in Pizza Di Mario."

In concluding that LSM was liable for the cleanup at the karate studio, the court also credited the testimony of Menald, explicitly observing that he testified that it was industry standard, for a remediation job like the one at issue, to "continue removal until you get all removed, wet drywall, wet wall materials. So [remediation is] continued until you receive clearance, and clearance, you would have to remove and mitigate any materials that were impacted by the loss." Moreover, Menald stated this process would include "[t]he entire affected area."

Additionally, the court found that "to adequately sanitize Pizza Di Mario and obtain Health Department clearance to reopen as required by the Rancho Cucamonga Fire Department's closure order . . . , it was necessary to remediate the contaminated materials at the karate studio with which the restaurant shared a dividing wall."

LSM does not address these findings by the court or otherwise explain why substantial evidence does not support the court's conclusions. As such,

19

we determine that LSM has not satisfied its burden as appellant on this issue.  (See *Jameson*, *supra*, 5 Cal.5th at pp. 608–609; *Denham*, *supra*, 2 Cal.3d. at p. 564.)

LSM's final argument here is that the two year statute of limitations applies to ACR's equitable claims because those claims are not based upon a written contract.  (See Code. Civ. Proc., § 339.)  But that argument depends on LSM successfully arguing that the trial court erred in finding ACR and LSM entered into a valid contract.  Because we were not persuaded by LSM's challenge to the validity of the ESA, its final contention regarding the appropriate statute of limitations that applies to ACR's equitable claims necessarily fails.

DISPOSITION

The judgment is affirmed.  ACR is awarded its costs of appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


KELETY, J.

20