136 Cal.App.3d 387 (1982)
186 Cal. Rptr. 218
SANDERS CONSTRUCTION COMPANY, INC., Plaintiff, Cross-defendant and Respondent,
v.
SAN JOAQUIN FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, Defendant, Cross-complainant and Appellant; ART SANDERS, Cross-defendant and Respondent.
Docket No. 5186.
Court of Appeals of California, Fifth District.
October 7, 1982.
*390 COUNSEL
Freeman, Rishwain, Hall & Spatola, Freeman, Rishwain, Hall, Spatola & Shore, Maxwell M. Freeman and Charles R. Spatola, Jr., for Defendant, Cross-complainant and Appellant.
Stockton & Schrimp and Cleveland J. Stockton for Plaintiff, Cross-defendant and Respondent and for Cross-defendant and Respondent.
*391 OPINION
ANDREEN, J.
Respondent Sanders Construction Company, Inc. (Sanders Construction) and appellant San Joaquin First Federal Savings and Loan Association (S&L) entered into an agreement providing for the construction of a building on land belonging to Sanders Construction and the leasing of the major portion of same to S&L.
S&L appeals from a judgment against it for damages and against it on its cross-complaint against Sanders Construction.

FACTUAL BACKGROUND
Sanders Construction owned an unimproved lot in Modesto upon which S&L wanted to build a branch office. The presidents of the two corporations, Art Sanders of Sanders Construction and Bill Chapman of S&L, negotiated in late 1976 and early 1977 for a lease arrangement under which Sanders Construction would construct a building on its property for occupancy by S&L. During these discussions the parties agreed upon the description of the premises, the terms, the rental amount, the building costs, and that appellant's architect would design the building.
Further facts will be developed as required.

MUTUAL ASSENT
The agreement went through the usual changes and revisions. After execution by S&L, Sanders Construction suggested certain revisions. These were prepared by the attorney for S&L in the form of corrected pages to be inserted into the original lease. The court found, and substantial evidence sustains such a finding, that Sanders Construction inserted the corrected pages in the agreement, executed same, and sent an executed copy to S&L.
The agreement as executed provided that the building would be constructed in accordance with plans and specifications to be set forth and to be attached as "Exhibit C." At the time the agreement was executed, both parties knew Exhibit C did not exist because the architect had not finished the plans and specifications.
The agreement provided for S&L to have full architectural control: "Landlord shall construct a building on the premises according to plans and specifications which Tenant has caused to be prepared and which are *392 approved by Landlord, a copy of which plans and specifications are attached as Exhibit C...." The lease agreement also provided, "Tenant shall retain architectural control of the total development...."
(1) It is argued by S&L that Sanders Construction never approved of the plans, and in fact criticized them and modified them as to the portion of the building which Sanders retained for leasing out to third parties. Therefore there was no mutual assent and no contract.
S&L relies upon Robinson & Wilson, Inc. v. Stone (1973) 35 Cal. App.3d 396 [110 Cal. Rptr. 675]. A contractor and the owner entered into a construction contract. Part of the building was to be left vacant so that it could be finished in accordance with the wishes of tenants which the owner expected to secure in the future. Because the bank financing the scheme objected to the unfinished space, the parties amended the proposed contract to include a provision providing for a certain sum to complete the space in accordance with plans and specifications to be prepared by owner's architect in the future. It provided, in part: "`The Contractor will furnish all necessary labor and materials to complete and finish the said areas generally with the materials and to the standards fixed in the plans and specifications presently in existence for the other areas of the building and specifically may be required by the said tenant's architect and will, accordingly, furnish, construct, and install the following items: ...'" (At pp. 400-401.)
Predictably, the plans as furnished resulted in cost estimates far in excess of the amount originally specified.
A dispute as to responsibility for the excess cost resulted in legal action. The trial court found for the owner and against the contractor for the reasonable cost of certain additions. This judgment was reversed on appeal. The appellate panel found that the amendment lacked certainty. The trial court's finding that the agreement called for "standard" or "minimal" medical suites was supported by substantial evidence, but those words were deemed so indefinite and uncertain that there was no meeting of the minds. Also, as interpreted by the trial court, the amendment obligated the contractor to complete the undesigned area for a guaranteed maximum contract price plus the reasonable value of any "extra" work required by tenants. There was no evidence of how such value was to be determined  on cost plus or other basis  or who was to pay for the extras. As to the "extras," the amendment was a promise to agree in the future. (Id., at pp. 407-409.)
*393 The appellate panel distinguished Bohman v. Berg (1960) 54 Cal.2d 787 [8 Cal. Rptr. 441, 356 P.2d 185] on several grounds, including that performance of an uncertain contract without objection shows the intentions of the parties. Also distinguished were Mason v. Ennes (1959) 172 Cal. App.2d 99 [342 P.2d 79] and Bettancourt v. Gilroy Theatre Co., Inc. (1953) 120 Cal. App.2d 364 [261 P.2d 351], because in both "cost was not an element of the covenant...." (Robinson & Wilson, Inc. v. Stone, supra, 35 Cal. App.3d at p. 411.)
The case at bar is distinguishable from the Robinson & Wilson case. The architect, as agent for S&L, submitted plans to Sanders Construction which then made its cost estimate for the major part of the building based on these plans. The part of the building which was to be leased out by Sanders Construction to another tenant was modified by an architect engaged by Sanders Construction to cut costs in that part and to conform to the prospective lessee's desires. No substantial change was made to the exterior, save the incidental one of eliminating a couple of planters. Although S&L did not learn of this modification until trial, the modification was inconsequential because of its insignificant impact on the space leased to appellant.
In Robinson & Wilson, the contract was to finish interiors to build suites for unknown physicians with unknown needs. In the case at bench the needs of the S&L were known and its needs were met by plans submitted by its architect. Sanders Construction accepted the fact that S&L had architectural control, and made cost estimates on the plans in accordance therewith. The fact that Art Sanders thought that the structure was overdesigned does not militate against the fact that Sanders was willing to go ahead with construction. The fact that Sanders recommended that S&L use a different builder does not detract from the fact that he was willing to go ahead with the plans as drafted. The suggestion of use of another builder was to protect Sanders Construction from a charge of overbidding the project.
Reliance also is placed on King Lumber Co. v. National Bank (4th Cir.1923) 286 Fed. 906, wherein a construction contract was executed giving no description of the building to be built but providing that it was to be in accordance with plans to be submitted by the owner's architect. The plans submitted were not accepted by the builder. After the owner withdrew from the contract, the builder sued for breach. The circuit court affirmed a directed verdict for defendant owner, holding that the contract was so indefinite that the parties never had an agreement.
*394 The King Lumber Co. case is distinguishable because the reviewing court found the contract indefinite not only because of a lack of plans and specifications, but also because of the lack of any definite description of the structure.
The instant case is more like S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp. (1976) 58 Cal. App.3d 173 [130 Cal. Rptr. 41]. The case involved a commercial structure  a multistoried garage with surface and second floor space devoted to commercial uses, ultimately a bank. Only the space to be devoted to garage uses was the subject of litigation. The owner of the land contracted with a parking lot operator for the lease of the land with a structure to be built thereon in accordance with plans and specifications. As in the case at bench, such were nonexistent. The owner subsequently sold the land and then leased it back as a developer, with a sublease to the operator. Meanwhile, many plans and specifications were being developed, all of which were satisfactory to the operator. Finally the new owner and developer decided to change the structure to only a three-level subterranean garage, although the lease agreements referred to nine levels above ground and two below the ground.
In the subsequent litigation, a judgment in favor of the operator for lost profits was affirmed. In reviewing precedent, the appellate panel, speaking through Justice Kaus, stated that "the cases simply do not support the rule that specifications are a sine qua non of an enforceable contract." (Id., at p. 180.)
The parties had agreed that the structure would fill a specified lot, consist of a stated number of levels, have specified entrances and exits, contain about 425 spaces with a yearly rental deduction if there were fewer, and contain commercial establishments on the first and part of the second floors. The court held that the specificity required for an enforceable contract depends upon the circumstances. The fact that the parking structure was not to be built until all parties had approved plans and specifications took nothing away from the certainty of the agreement, since the parties agreed that they would not withhold approval unreasonably. (Id., at pp. 182-183.)
In the case at the bench, the agreed terms had specificity. The parties agreed upon a 6,000-square-feet, single-story, free-standing office building in which 4,000 square feet would be utilized by S&L. "Off-site" improvements were specified. There was agreement as to the nature of the common areas, their use and proration of costs of maintenance. Sanders Construction was to pay $140,000 of the cost of *395 construction of the portion of the building to be occupied by S&L. Sanders Construction could be indifferent about any extraordinary costs occasioned by the tastes of S&L's architect, since any cost in excess of $140,000 was to be paid by S&L.[1] Sanders Construction was to pay for that portion of the building  2,000 square feet  that was not leased to S&L. The agreement became more definite when foundation plans were submitted by the architect for S&L and when Sanders Construction obtained the necessary governmental permits and constructed the foundation on the premises. Under the liberal rule of S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp., supra, 58 Cal. App.3d 173, this is sufficient.
As a separate and alternative ground for finding that the lease was valid, we note that in order to obtain construction financing the parties jointly executed a "Notice and Acknowledgement of Lease Assignment" and delivered same to Wells Fargo Bank. S&L acknowledged therein: "As tenants under the above referenced Lease, we hereby acknowledge that said Lease is in full force and effect, that we have no rental offsets, claims or defenses to the enforcement of the Lease...." S&L is bound by this statement, since a recital in a written instrument is conclusively presumed to be true as to the parties. (Evid. Code, § 622.)

COMPETENCY OF ART SANDERS
(2) S&L contends that Art Sanders, the president of Sanders Construction, was incompetent as a witness because, in the words of section 701 of the Evidence Code, he was "(i)ncapable of expressing himself...." (Evid. Code, § 701, subd. (a).)
Art Sanders is a diabetic and suffered a momentary sugar deficiency during trial which was relieved by sugar intake within a few minutes. While indisposed, he was confused momentarily, which was evident to all present. The following day on cross-examination, he was interrogated in extensive detail by counsel for S&L on the matters covered during his indisposition the previous day. Responses were elicited which reflected inconsistency in one area of interrogation. Counsel for S&L then informed the court that it might be necessary to review all of Art Sanders' testimony of the previous day. The court indicated counsel would be permitted to do so. S&L's counsel requested a transcript of the testimony for use in his further cross-examination. The following day he requested a determination of competency of Mr. Sanders. The court *396 denied such request and indicated that the court would "determine his credibility based on everything."
Although a formal ruling would have been preferable, the court impliedly found that Art Sanders was competent, and that the discrepancies in his testimony went to the issue of credibility, not competency. Questions regarding competency are almost wholly a matter of trial court discretion. (People v. Harrison (1912) 18 Cal. App. 288, 295 [123 P. 200], disapproved on another point in People v. McCaughan (1957) 49 Cal.2d 409 [317 P.2d 974].) We find no error.

EXECUTED ORAL AGREEMENT
The court below made a finding that discussions between the parties constituted an oral agreement whereby S&L would construct the building rather than Sanders Construction, and that this "constituted an executed oral agreement supported by adequate consideration...."
(3) It is contended on appeal that there is not substantial evidence to support a finding that the oral agreement was executed.
In respect to Sanders Construction, it fully executed the oral modification. It had secured already the necessary financing, and, although the foundation was in place, it agreed to and did abstain from constructing the building. As to S&L, it performed to the extent that it did not use Sanders Construction services to build the structure. Instead, it contacted a builder of its choice who picked up the plans from Sanders Construction and submitted a bid.
It is the contention of S&L that the agreement would not be executed until the construction of the building was completed. The law appears to be to the contrary. In D.L. Godbey & Sons Const. Co. v. Deane (1952) 39 Cal.2d 429 [246 P.2d 946] our Supreme Court ruled that if the party relying on the oral modification has performed and there is consideration for the oral modification agreement, the contract may be enforced as modified whether or not the other party had performed. (At pp. 433-434; accord Raedeke v. Gibraltar Sav. & Loan Assn. (1974) 10 Cal.3d 665, 673 [111 Cal. Rptr. 693, 517 P.2d 1157].) Sanders Construction had fully performed. It set aside the building site and did some cement work thereon. It arranged the necessary financing. It did not continue to construct the building. As stated in Coldwell Banker & Co. v. Pepper Tree Office Center Associates (1980) 106 Cal. App.3d 272, 280 [165 Cal. Rptr. 51]: "How can you execute an agreement not to perform? Answer: By not performing." Further, there was adequate consideration *397 for the oral modification agreement. Sanders Construction, for instance, relinquished its right to make a profit on the construction of the building.[2]

RESCISSION
(4) On October 25, 1977, after the delay by S&L in starting construction put the construction and takeout financing in jeopardy, Sanders Construction sent a letter demanding that construction commence by November 10, 1977, and that "Failure to do any of the above shall be deemed to be a default of the lease and shall make said lease null and void."
S&L seized upon this as a way of effecting a mutual rescission, and mailed a document so indicating on November 9, 1977. However, before this was received, Art Sanders had called the president of S&L, Mr. Chapman, and had informed him that the letter should be disregarded.
The Sanders Construction letter was not a repudiation, but a demand for performance. To the extent that it constituted an offer to rescind, the offer was withdrawn before it was accepted and therefore had no effect on the rights of the parties.

DAMAGES
The trial court awarded Sanders Construction $192,600 general damages  $28,600 for rent liability and $164,000 for failure to construct the improvements. No complaint is made in reference to the amount of rent liability. Appellant contends, however, that the award of $164,000 is excessive.
The court calculated the latter amount by accepting the cost estimate of Sanders Construction of $304,000 for the building, which was the lower of two cost estimates, deducting therefrom the $140,000 which Sanders Construction was required to contribute and awarded the difference of $164,000 as damages.
(5) S&L contends that awarding the full value of its cost of constructing the building gives Sanders Construction more than it bargained for, since Sanders would not be able to have the use of the building until the lease expired, 25 years after occupancy. The value, it is argued, should be the reversionary interest  the value of the used building at the end of the 25-year lease.
*398 The difficulty with the argument is that the measure of damages used was precisely the one suggested by S&L in its trial brief. In its motion for new trial, it contended that the proper measure was the value of the reversionary interest. Although this new theory was rather late, it is apparently sufficient to preserve the matter for appeal. (See generally Sholar v. Barker (1962) 211 Cal. App.2d 31, 32-33 [27 Cal. Rptr. 451]; Hahn v. Hahn (1954) 123 Cal. App.2d 97, 102 [266 P.2d 519].) The effect of the rule is ameliorated somewhat where, as here, the trial court awarded reasonable attorney fees to Sanders Construction. An increase of the award would in part compensate for the inconvenience occasioned by the untimely argument.
S&L further asserts that the value of the reversionary interest should be reduced to present value, and that the cost of on and offsite work be deducted.
We agree that the measure of damages used by the trial court was erroneous. Sanders Construction was awarded the present cost of the improvements even though it could not enjoy them until 25 years later at the end of the lease term. At that time, the building would have depreciated in real value. Also, the award was not reduced to present value.
There is little guidance as to what measure of damages is appropriate. The editor of an annotation in 63 A.L.R.2d at page 1110 notes that the cases are so conflicting that "No generalization can safely be made respecting the measure and items of damage to which the lessor may become entitled upon breach by the lessee of an agreement or covenant to erect a building on the leased premises." (As further evidence of the confusion in this area, see 51C C.J.S., Landlord and Tenant, § 393, p. 1015.)
We turn to statutory law. Acting pursuant to a recommendation of the California Law Revision Commission, the Legislature enacted Civil Code section 1951.2 in 1970. (1 Assem. J. (1970 Reg. Sess.) p. 626.) We set it forth in the margin.[3] It is an admirable attempt to engraft the contract *399 remedy of loss of bargain onto real property law. (Recommendation Relating to Real Property Leases (Nov. 1969) 9 Cal. Law Revision Com. Rep. (1969) Appendix IV, pp. 157-163.) It abrogates the common law rule that the lessee's obligation to pay rent depends on the continued existence of the term. It encourages the lessor to mitigate damages by no longer requiring the reletting of the property to be for the benefit of the lessee. Its formula for damages permits the lessee to prove what rental loss could have been avoided. It provides for discounting unpaid future rent to present value. (2 Assem. J. (1970 Reg. Sess.) pp. 3040-3044 [reprinted as legis. committee com.  Assem. to Civil Code, § 1951.2, 10 West's Ann. Civ. Code (1982 pocket supp.) pp. 110-111].)
What did Sanders Construction lose as a result of the breach by S&L? In answering we note that an award of the value of the reversionary interest at the end of the lease discounted to present value neglects to account for the benefit of having a substantial building on the premises during the lease term as security for payment of rent.[4] The fact that the tenant paid more than $160,000 for constructing the building would be *400 substantial inducement to maintain possession and pay rent. Also, the formula as used by the trial court disregards the remedy set forth in subdivision (a)(3) of Civil Code section 1951.2  the difference between the rental loss for the balance of the term under the lease and the amount of rent which Sanders Construction could reasonably secure for the same period. Finally, since this matter must be remanded for further evidence on damages, lost rent between the last trial and the new hearing should be awarded to the extent that S&L cannot prove that the loss could have been reasonably avoided. (Civ. Code, § 1951.2, subd. (a)(2).)
Sanders Construction had a duty to mitigate damages by attempting to re-lease the premises. (Id., subds. (a)(2), (a)(3); see 2 Assem. J., supra, p. 3042 [10 West's Ann. Civ. Code (1982 pocket supp.) p. 111].) We understand that this has been done, although we have nothing before us to indicate the nature of the lease, any of its terms, the type of building erected, or the financing used.
In an attempt to devise an appropriate measure of damages we offer the following guidance to the trial court in this case:
Assess unpaid rent pursuant to subdivision (a)(2) of Civil Code section 1951.2. When doing so, S&L should be given the benefit of the fact that Sanders Construction did not have to service the takeout loan for $140,000 to construct the office building. That is, the rental of $2,600 per month should be reduced by the amount of interest that Sanders Construction would have had to pay on its $140,000 loan.[5] Rent should be paid up to the date of the award on the second hearing unless the premises have been rented in the interim. Also, S&L should have the opportunity to prove that some of the rental loss could have been avoided.
When ascertaining the amount of damages pursuant to subdivision (a)(3) of Civil Code section 1951.2, an attempt should be made to *401 ascertain the amount of yearly rent allocable to the bare land as negotiated by the parties herein (we understand .106 times an agreed value for the land) as against the rent for the land for any new lease on the premises. If a lease is on more favorable terms, S&L is entitled to a credit. If on less, Sanders Construction is entitled to damages. In either event, the amount so computed will be reduced to present value by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1 percent.
Civil Code section 1951.2, subdivision (a)(4) provides that the lessor may recover an "amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease...." As the legislative committee comment to this section makes clear, the lessor, in addition to lost rent, is entitled to "all of the other damages a person is entitled to recover for the breach of a contract...." (Ibid.) Thus, Sanders Construction is entitled to any other damages caused by the breach. These might include costs for cleaning up the property; brokerage and legal fees incurred in seeking a new tenant; permit fees; an evaluation of the security interest under the former lease for payment of rent by virtue of the fact that S&L was to have a large investment in the building, as against the security for payment on rent in a new lease;[6] and any other special damages incurred as a proximate result of the breach.
It is difficult to devise a remedy for the loss of reversionary interest. We agree with S&L that the building should be valued at the end of the lease (25 years after commencement) and that that value should be discounted to present value. For consistency and to carry out the spirit of the law, the discount rate provided in Civil Code section 1951.2, subdivision (b) should be utilized.[7] In the event that Sanders Construction has a reversionary interest under a substitute lease on the same property, the same process should be undertaken as to it. The difference between the two should be added to the damages to be awarded Sanders Construction if the value of the reversionary interest of the building in the instant lease exceeds the one in the substitute lease. If the latter is the greater, S&L is entitled to a credit.
S&L may be entitled to a credit for the cost to Sanders Construction of the offsite work, since the trial court found that under the oral modification agreement Sanders Construction had assumed responsibility *402 for that aspect of the construction. If such an award is made, it should be for two-thirds of such cost, as that is the portion of the work the parties had ascribed to Sanders Construction. Whether or not such a credit should be given is dependent on the nature of the agreement that Sanders Construction was able to make with a subsequent tenant. If, in order to secure a tenant for the property, it had to pay for such offsite work, there should be no credit.
We have attempted to give some guidance to the trial court on remand. It is impossible to be more specific without knowledge of the terms of any subsequent lease and the financing used. The issue is as much one of economics as it is of law. We are confident that the trial court will be resourceful in fashioning an award that will give Sanders Construction the full benefit of its bargain, and no more.
We remand for a redetermination of damages.

FINDINGS
S&L has made various attacks on the findings, which are based upon failure to understand the function of the substantial evidence rule and the role of findings of fact and conclusions of law. None of the attacks is meritorious.

CROSS-COMPLAINT
Complaint is made of the trial court's finding against S&L on its cross-complaint. We have reviewed the findings and judgment and find them well supported by substantial evidence.

CONCLUSION
The judgment is affirmed and remanded for recomputation of damages in accordance with the views expressed herein. The trial court shall allow reasonable attorney fees to Sanders Construction for representation during this appeal.
Zenovich, Acting P.J., and Hammer, J.,[*] concurred.
NOTES
[1] Here, as the Robinson & Wilson court noted in distinguishing Mason v. Ennes and Bettancourt v. Gilroy Theater Co., Inc., "cost was not an element." (Ante, at p. 393.)
[2] We see nothing in the 1976 amendments to Civil Code section 1698 which would change the Godbey rule.
[3] "(a) Except as otherwise provided in Section 1951.4, if a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. Upon such termination, the lessor may recover from the lessee:

"(1) The worth at the time of award of the unpaid rent which had been earned at the time of termination;
"(2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided;
"(3) Subject to subdivision (c), the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided; and
"(4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom.
"(b) The `worth at the time of award' of the amounts referred to in paragraphs (1) and (2) of subdivision (a) is computed by allowing interest at such lawful rate as may be specified in the lease or, if no such rate is specified in the lease, at the legal rate. The worth at the time of award of the amount referred to in paragraph (3) of subdivision (a) is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1 percent.
"(c) The lessor may recover damages under paragraph (3) of subdivision (a) only if:
"(1) The lease provides that the damages he may recover include the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award, or for any shorter period of time specified in the lease, exceeds the amount of such rental loss for the same period that the lessee proves could be reasonably avoided; or
"(2) The lessor relet the property prior to the time of award and proves that in reletting the property he acted reasonably and in good-faith effort to mitigate the damages, but the recovery of damages under this paragraph is subject to any limitations specified in the lease.
"(d) Efforts by the lessor to mitigate the damages caused by the lessee's breach of the lease do not waive the lessor's right to recover damages under this section.
"(e) Nothing in this section affects the right of the lessor under a lease of real property to indemnification for liability arising prior to the termination of the lease for personal injuries or property damage where the lease provides for such indemnification."
[4] See O'Brien v. Illinois Surety Co. (6th Cir.1913) 203 Fed. 436, 439, in which it is established that when a lessee agrees to erect a building which materially increases the rental value of the premises, the building constitutes additional rent at the end of the term and security for rental payments to be paid in the interim.
[5] If S&L had performed rather than breached, Sanders Construction would have had to borrow $140,000 to pay its share of the cost of constructing the building. The interest expense for servicing that loan would have reduced the real income from rent. If judgment were given for the full rent, Sanders Construction would be in a better position by virtue of the breach than it would have if S&L had performed. This is contrary to the legislative intent manifested in the various provisions of section 1951.2 of the Civil Code. That section is designed to give the lessor the benefit of his bargain, but not more. Thus, the landlord is required to mitigate damages by avoiding rental loss by taking reasonable steps to relet the property, and lump sum awards of future rentals are discounted to reflect prepayment. See the legislative committee comment and Law Revision Commission recommendation for a general discussion of the concept. (2 Assem. J., supra, pp. 3041-3044 [10 West's Ann. Civ. Code (1982 pocket supp.) pp. 110-111]; 9 Cal. Law Revision Com. Rep., supra, pp. 157-163.)
[6] Any difference in the financial strength of S&L and a substitute lessee is irrelevant.
[7] In light of our disposition of this case, appellant's motion that we take judicial notice of present value tables is denied.
[*] Assigned by the Chairperson of the Judicial Council.