[No. E025404. Fourth Dist., Div. Two. June 13, 2000.]

PLAZA FREEWAY LIMITED PARTNERSHIP, Plaintiff and Appellant,
v.
FIRST MOUNTAIN BANK, Defendant and Respondent.

COUNSEL

Klein & Wilson and Gerald A. Klein for Plaintiff and Appellant.

Mower, Koeller, Nebeker, Carlson & Haluck, Reynolds & Jensen and Barry R. Swan for Defendant and Respondent.

OPINION

GAUT, J.—

## 1. *Introduction*

Plaza Freeway Limited Partnership (plaintiff) and First Mountain Bank (defendant) are successors in interest to the original landlord and tenant of

commercial real property under a 25-year lease agreement. The parties were unable to determine the termination date of the ground lease. Nevertheless, at the time of plaintiff's purchase of the property, defendant signed and delivered an estoppel certificate which provided a lease termination date of October 31, 1998. The trial court found the date on the estoppel certificate incorrect, and instead decided that the termination date was June 30, 1999. The court concluded that, based on the June 1999 termination date and the terms of the original lease agreement, defendant's exercise of its option to renew on January 26, 1998, was timely. Thus, the court found defendant in lawful possession of the property and not guilty of an unlawful detainer.

On appeal, plaintiff claims the doctrine of "estoppel by contract," as codified in Evidence Code section 622,[1] requires that the facts contained in the estoppel certificate, including the termination date, are conclusively presumed to be true.[2] Defendant contends the conclusive presumption is inapplicable because an estoppel certificate is not a written "instrument" under section 622.

Based on our analysis below, we conclude that the estoppel certificate was a written "instrument" within the meaning of section 622, and, therefore, defendant was bound by the representations contained therein. According to the October 31, 1998, termination date stated in the estoppel certificate, defendant's attempt to exercise its option to renew was untimely. We reverse the trial court's judgment that defendant was not guilty of an unlawful detainer.

## 2. *Factual and Procedural History*

Plaintiff and defendant are assignees of a 25-year lease that was executed on June 1, 1973. The subject property of the lease was part of a shopping center located in Big Bear, California. Under the lease, the original tenant was required to construct a building to house a Security Pacific National Bank. The lease provided as follows: "The term of this Lease shall be twenty-five (25) years; plus the partial month, if any, immediately following the commencement of the lease term. The lease term shall commence on the earlier of: (a) 180 days after Landlord has delivered the demised premises to Tenant ready for Tenant's construction as provided in Article 11, hereafter, or (b) on the date Security Pacific National Bank opens for business on the demised premises.

"As soon as the date of commencement of the Lease term has been determined, the parties hereto shall execute and deliver to one another

---

[1]All further section references will be to the Evidence Code unless otherwise stated.

[2]Because this issue is dispositive, no further discussion of alternate issues is necessary.

an appropriate addendum to this Lease setting forth said date of commencement."

Article 11 of the lease agreement provides: "Landlord shall, at its sole cost, within one hundred twenty (120) days after the execution of this Lease, deliver possession of the demised premises to Tenant at final grade and at 90 per cent [sic] compaction, ready for Tenant's construction in all respects."

Although a subsequent addendum to the lease was contemplated, none was found. Security Pacific National Bank opened for business on June 14, 1974.

In 1992, plaintiff purchased the shopping center from Chartered Pension Real Estate Investors (Chartered), a successor in interest to the original landlord. During the transaction, Chartered required each tenant of the shopping center, including defendant, to sign and deliver an estoppel certificate that set forth the key terms of each lease, including the termination date. Defendant's estoppel certificate provided that, "The term of this Lease commenced on November 1, 1973 and will expire on October 31, 1998." After review by defendant's highest officers, the chief financial officer, Hazel M. Hagy, signed the certificate without making any changes.

Under the lease, defendant had three successive five-year options to renew. According to article 3 of the lease, the tenant was required to notify the landlord of its intent to renew 12 months before the expiration date of the initial 25-year term.

On January 26, 1998, defendant's chief financial officer, Hazel M. Hagy, sent plaintiff a letter expressing defendant's intent to exercise its renewal option. Plaintiff rejected defendant's request as untimely. Defendant sent a second notice, which explained its belief that the termination date was on March 29, 1999.

Defendant remained in possession of the premises on and after October 31, 1998. Plaintiff filed an unlawful detainer action against defendant.

At the close of trial, the court explained that, based on the language of article 2 in the lease agreement, the original landlord and tenant had anticipated some delay prior to the delivery of the subject property. The court reasoned that the earliest possible termination date, albeit inconsistent with article 2, would have been May 31, 1998 (25 years from the date of execution), and the latest possible termination date would have been June

30, 1999 (25 years from the date the bank opened).[3] The court further reasoned that the October 31, 1998, date, as noted in the estoppel certificate, would not have been consistent with the language of article 2. Additionally, the court found that plaintiff failed to demonstrate any detrimental reliance on the estoppel certificate based on the list of rents paid by the tenants of the shopping center, which indicated that defendant paid only 1.7 percent of the total rent revenue. The court concluded that, in accounting for a six-month delay for delivery and a six-month period before commencement, as provided under article 2, the lease had started on June 30, 1974, and ended on June 30, 1999, 25 years later. Therefore, the court found defendant in lawful possession of the property and not guilty of an unlawful detainer. The court also awarded defendant approximately $45,000 in attorneys' fees and costs.

### 3. *Discussion*

On appeal, independent review applies to a case involving only questions of law, such as the interpretation of statutes or contracts, and, therefore, this court is not bound by the trial court's analysis and conclusions. (*People v. Taylor* (1992) 6 Cal.App.4th 1084, 1103 [8 Cal.Rptr.2d 439]; see also *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160].)

Plaintiff claims that defendant was estopped from contradicting the October 31, 1998, termination date on the estoppel certificate under section 622.

Section 622 provides, in relevant part: "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest . . . ." Defendant argues that the conclusive presumption contained in section 622 is inapplicable because the estoppel certificate did not constitute a written "instrument." Based on our analysis below, we conclude that the estoppel certificate constituted a written "instrument," within the meaning of section 622, and, consequently, defendant was estopped from contradicting the material terms contained therein.

In an early case, *Hoag v. Howard* (1880) 55 Cal. 564, the California Supreme Court, in considering the provisions of the Civil Code, stated that

---

[3]In support of the June 1999 termination date, Michael Leseney, a former corporate officer involved in the development of the subject property, testified concerning documents prepared in 1981, 1983, and 1987 that included the June 1999 date. Plaintiff was unaware of these documents because it purchased the property in 1992. In fact, Dennis Shollenburg, the president of First Mountain Bank, testified that while he had never informed plaintiff of the June 1999 date, he had sent two letters to plaintiff that indicated the October 1998 termination date.

the word "instrument" "will be invariably found to indicate some written paper or instrument signed and delivered by one person to another, transferring the title to or creating a lien on property, or giving a right to a debt or duty." (*Id.* at p. 565.)

The written paper or instrument need not represent an agreement. (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 684 [165 Cal.Rptr. 222].) In *Generes*, the court clarified the misconstruction of the term, "written instrument," by the court in *People v. Fraser* (1913) 23 Cal.App. 82 [137 P. 276]. In *Fraser*, the court wrote: "Generally the term 'instrument' as applied to documents necessarily imports a paper writing; but every paper writing is not necessarily an instrument within the settled statutory meaning of the term. With reference to writings the term 'instrument' as employed in our statutes has been defined to mean *an agreement expressed in writing, signed, and delivered by one person to another, transferring the title to or creating a lien on real property, or giving a right to a debt or duty.* [Citations.] This definition of the term as applied to writings contemplated, created, and controlled by various code provisions, has been repeatedly followed and applied in a variety of cases. Thus, for example, it has been held that a notice of *lis pendens* is not an instrument in the sense contemplated by our statutes [citation]; that a map is not an instrument within the meaning of the recording act [citation]; that neither an attachment nor a judgment is an instrument within the meaning of section 1107 of the Civil Code [citation], and that a notice of a claim of water-rights, although required to be recorded by section 1415 of the Civil Code, is not an instrument within the accepted definition of statutory instruments [citation]." (*Id.* at pp. 84-85, italics added.) Based on its interpretation, the court concluded that a birth certificate did not constitute an "instrument" within the meaning of Penal Code section 115.[4] (*Fraser, supra,* 23 Cal.App. at p. 86.)

In paraphrasing the definition of "instrument" set forth in *Hoag v. Howard, supra,* 55 Cal. 564, the *Fraser* court inserted the word "agreement." In doing so, the court significantly narrowed the scope of qualifying documents. (*Generes v. Justice Court, supra,* 106 Cal.App.3d at p. 683.) Subsequent cases, including one cited by defendant, *Rich v. Ervin* (1948) 86 Cal.App.2d 386 [194 P.2d 809], repeated the *Fraser* court's definition. The court in *Generes* observed: "Unfortunately, [*Fraser*], the appellate decision first employing the foregoing definition, distorted the sense of language in

---

[4]Penal Code section 115, subdivision (a) provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony."

[*Hoag v. Howard, supra,* 55 Cal. 564], upon which it relied, and subsequent appellate decisions have uncritically accepted the limitations imposed by the *Fraser* definition. As a result, in those cases the term 'instrument' has been narrowly construed to exclude written documents that do not embrace an agreement, some of which undoubtedly would fall within a more generic definition of the term 'instrument.' [Citations.]" (*Generes, supra,* at p. 683.)

The *Generes* court concluded that, "to qualify as an instrument within Penal Code section 115, a document need not represent an agreement; moreover it is not necessary that such a document be one that requires a delivery as a condition of validity." (*Generes v. Justice Court, supra,* 106 Cal.App.3d at p. 684.) In applying its reasoning and legal conclusions to the facts in the case, the *Generes* court held that "a deed purporting to transfer an easement in real property from oneself to oneself is an instrument . . . ." (*Ibid.*)

Appellate decisions after *Generes* followed its analysis. (See, e.g., *People v. Parks* (1992) 7 Cal.App.4th 883, 887 [9 Cal.Rptr.2d 450] [temporary restraining order was an instrument]; *People v. Tate* (1997) 55 Cal.App.4th 663, 667 [64 Cal.Rptr.2d 206] [work referral forms, which reflected the number of hours a probationer worked on a service project, were "instruments" within the meaning of Pen. Code, § 115].) Indeed, even this court cited *Generes* in affirming convictions under Penal Code section 115 for filing false bail bonds. (*People v. Garcia* (1990) 224 Cal.App.3d 297, 306-307 [273 Cal.Rptr. 666].)

Defendant argues that *Generes* and the cases following *Generes* are inapposite because they involved the interpretation of the word "instrument" as used in Penal Code section 115. For the reasons below, this is a distinction without a difference.

It is a well-established rule of statutory construction that, "[w]hen a word or phrase is repeated in a statute, it is normally presumed to have the same meaning throughout." (*People v. McCart* (1982) 32 Cal.3d 338, 344 [185 Cal.Rptr. 284, 649 P.2d 926]; *Hoag v. Howard, supra,* 55 Cal. at p. 565.) Even in *Fraser,* the court noted: "The context of [section 115 of the Penal Code] does not indicate that the term 'instrument' as employed therein was intended to mean anything different in form and effect from the 'instrument' repeatedly referred to in numerous and various other sections of our code system. Nothing to the contrary appearing (either expressly or impliedly) from the language of the code section under discussion, it is inconceivable that the legislature intended that the word 'instrument' as used

in that section should have any different or broader meaning than that uniformly contemplated by every other code section wherein the word is to be found. It must therefore be presumed that the word 'instrument' as used in section 115 of the Penal Code, is limited in its meaning and application to that class of instruments invariably referred to throughout our statutes. [Citations.]" (*People v. Fraser, supra*, 23 Cal.App. at p. 84.)

Albeit in dicta, the court in *Generes* indicated that, in widening the perforations in the sieve created by Fraser's definition, other documents would trickle out and qualify as instruments. (*Generes v. Justice Court, supra*, 106 Cal.App.3d at p. 683.) The examples noted by the court in *Generes* were a birth certificate (*People v. Fraser, supra*, 23 Cal.App. 82); a deposition (*Jennings v. American President Lines* (1943) 61 Cal.App.2d 417 [143 P.2d 349]); a homestead declaration (*Rich v. Ervin, supra*, 86 Cal.App.2d 386); dealer records from the Department of Motor Vehicles (*People v. Wood* (1958) 161 Cal.App.2d 24 [325 P.2d 1014]); a permit to issue securities (*People v. Olf* (1961) 195 Cal.App.2d 97 [15 Cal.Rptr. 390]); and a voter registration affidavit (*People v. Fox* (1977) 73 Cal.App.3d 178 [140 Cal.Rptr. 615]). We are not suggesting that all or any of these documents would qualify as instruments under *Hoag v. Howard, supra*, 55 Cal. 564. We are suggesting, however, that the *Generes* court, in its analysis of the term, did not differentiate between the word "instrument" as used in Penal Code section 115 and the use of the word elsewhere in the statutes.

We find no reason to continue in the detour created by *Fraser* in adopting a definition of "instrument" that includes the requirement that the document must evidence an agreement. *Fraser* provides no justification for the inclusion of the term "agreement" in the definition of the word "instrument."[5] Furthermore, after the *Generes* court's criticism of the definition in *Fraser*, no other published decision in California has relied on, or even cited, the *Fraser* case.[6] In essence, *Fraser*, which involved Penal Code section 115, misconstrued the term "instrument" and *Generes*, which also involved the

---

[5]The *Fraser* court may have used the term "agreement" to avoid using the word "instrument" in defining the word "instrument." The court in *Hoag* stated: "If we look into the provisions of the Code in which the word '*instrument*' is used, it will be invariably found to indicate some written paper or *instrument* signed and delivered by one person to another, transferring the title to or creating a lien on property, or giving a right to a debt or duty." (*Hoag v. Howard, supra*, 55 Cal. at p. 565, italics added.) It is possible that the *Hoag* definition is really no definition at all. Rather, when the court conducted a thorough evaluation of the Civil Code, it noted that when the word "instrument" was used, the types of documents the term generally referred to were those that transferred title, created a lien on property, or gave a right to a debt or duty.

[6]The Washington Supreme Court, in *State v. Price* (1980) 94 Wash.2d 810 [620 P.2d 994], cited *Fraser* for California's definition of the word "instrument." After comparing definitions

same criminal statute, clarified the confusion. Outside, as well as within, the context of Penal Code section 115, there is no basis for relying on the *Fraser* court's inaccurate definition.

Therefore, while some agreements are evidenced by written instruments, not all written instruments reflect an agreement between the parties. In fact, in *Generes*, the court noted that the *Hoag* definition "obviously was not restricted to agreements since a conveyance of realty needs no consideration for its validity." (*Generes v. Justice Court, supra*, 106 Cal.App.3d at p. 683, citing Civ. Code, § 1040.)

As we will now discuss, the *Hoag* interpretation of the word "instrument" was not an exhaustive list of qualifying documents. This court's cursory perusal of the Civil Code reveals the Legislature's use of the word "instrument" was not limited to the categories established in *Hoag*.[7] Rather, statutory references to the word "instrument" also support a commonsense or broader definition. (See, e.g., Civ. Code, §§ 843 [written instrument indicating, not only creating or giving, possessory rights or remedies of cotenants]; 987 [instrument waiving artist's rights to protect work of fine art from defacement, mutilation, alteration, or destruction]; § 2337 [instrument intending to bind principal].) Webster's Third New International Dictionary (1993) defines "instrument" as "a legal document (as a deed, will, bond, lease, agreement, mortgage, note, power of attorney, ticket on carrier, bill of lading, insurance policy, warrant, writ) evidencing legal rights or duties esp. of one party to another." (Webster's 3d New Internat. Dict. (1993) p. 1172.) Although the *Hoag* definition would not encompass some of the documents listed in the dictionary definition above,[8] the use of the word "instrument" in the broader sense in the statutes supports the conclusion that the *Hoag* definition is not an exhaustive list of all possible documents contemplated by the Legislature.

In light of the foregoing, we turn to the specific statute at issue here. ■ The conclusive presumption of section 622, formerly Code of Civil

---

used in other states, the court noted that " 'the term instrument is not one susceptible to an exact, precise and inelastic definition. It is employed in many different contexts in our law and its meaning shifts, sometimes subtly, sometimes not, depending on the context . . . . While in all cases the term serves to identify a class of paper writings, the type of document sought to be included in, or for that matter excluded from, the scope of a particular statutory enactment varies with the purpose that enactment seeks to serve. . . .' " (*Id.* at p. 998.)

[7]Obviously, when the Legislature uses the word "instrument" to indicate a tool or object, such references do not comport with Hoag's definition. (See, e.g., Civ. Code, §§ 847, 1791, 1882.3.)

[8]Again, in *Hoag*, the court held that a writ or judgment did not constitute an instrument. (*Hoag v. Howard, supra*, 55 Cal. at p. 566.)

Procedure section 1962, subdivision 2, codifies the common law doctrine of "estoppel by contract." (*Estate of Wilson* (1976) 64 Cal.App.3d 786, 801 [134 Cal.Rptr. 749].) Under section 622, "[t]he facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest . . . ." Although the word "instrument" as used in this section usually refers to a contract, we find the term also applies to estoppel certificates. In viewing an estoppel certificate as a binding confirmation of a lease agreement under section 622, while the departure from a contractual requirement is minimal, the impact on the reliability of commercial real estate transactions is significant. Furthermore, as a codicil to a will may reveal the most accurate intent of a testator (see *Wilson, supra*), an estoppel certificate reveals the present intent and understanding of the parties to a commercial lease agreement.

 "An 'estoppel certificate' (or 'offset statement') is a signed certification of various matters with respect to a lease [citation]. An estoppel certificate binds the signatory to the statements made and estops that party from claiming to the contrary at a later time." (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 1999) ¶ 7.292, p. 7-73 (rev. #1 1997).) Black's Law Dictionary defines "estoppel certificate" as "[a] signed statement by a party, such as a tenant or a mortgagee, certifying for the benefit of another party that a certain statement of facts is correct as of the date of the statement, such as that a lease exists, that there are no defaults and that rent is paid to a certain date. Delivery of the statement by the tenant prevents (estops) the tenant from later claiming a different state of facts." (Black's Law Dict. (6th ed. 1990) p. 551, col. 2.) By definition, an estoppel certificate is exactly the type of document to which application of section 622 would be appropriate.[9]

In *Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508 [73 Cal.Rptr.2d 708], the court addressed a situation similar to the one presented here. That case involved the sale and purchase of a medical office building for $22.2 million. The defendants owned the building. Wells Fargo Bank (Wells Fargo) leased space on the ground floor of the building. Bank

---

[9]In *Sanders Construction Co. v. San Joaquin First Fed. Sav. & Loan Assn.* (1982) 136 Cal.App.3d 387 [186 Cal.Rptr. 218], the court concluded that the parties' joint execution and delivery of a " 'Notice and Acknowledgment of Lease Assignment' " bound the tenant under section 622. (136 Cal.App.3d at p. 395.) The notice contained the following statement: " 'As tenants under the above referenced Lease, we hereby acknowledge that said Lease is in full force and effect, that we have no rental offsets, claims or defenses tot he enforcement of the Lease . . . .' " (*Ibid.*) Although, the court did not provide any analysis for this conclusion, it appears the court assumed that such written instruments were exactly the type of documents to which section 622 would apply.

Leumi (Leumi) subleased that space from Wells Fargo. Based on an agreement between the defendants and the prospective buyer, the plaintiffs, the defendants were obligated to furnish the plaintiffs with estoppel certificates signed by each tenant.

Leumi refused to sign an estoppel certificate. The appellate court colorfully noted that, "[t]he first willowy puffs of a storm cloud appeared when Wells Fargo also refused to sign an estoppel certificate for its subtenant." (*Linden Partners v. Wilshire Linden Associates, supra*, 62 Cal.App.4th at p. 513.) Although the defendants provided the plaintiffs with copies of the lease and sublease, none of those documents indicated the amount of Leumi's rent. Furthermore, although the sublease provided a formula for calculating the total rent, "[t]he key figure in the computation—the amount of operating expenses attributable to Wells Fargo to which the Leumi pro rata share was to be applied—was not shown." (*Id.* at p. 514.) After being advised of how to calculate Leumi's rent, the plaintiffs determined that the rent was $9,327.61 per month. "The storm clouds were gathering." (*Ibid.*) Consistent with the plaintiffs' calculation, the defendants signed and delivered an estoppel certificate on behalf of the tenant and subtenant, showing the total rent as $9,327.61.

After escrow closed, the plaintiffs received their first rent check from Leumi in the amount of $6,177.60. Apparently, the miscalculation, made by both parties, resulted from using the amount of Wells Fargo's pro rata share of operating expenses from 1972, instead of 1982, as provided in the lease. When the defendants refused to make up the difference, a lawsuit ensued.

The appellate court held that the defendants, by putting into escrow an estoppel certificate that incorrectly stated the amount of rent, breached the purchase agreement and thereby afforded the plaintiffs a right to seek damages. (*Linden Partners v. Wilshire Linden Associates, supra*, 62 Cal.App.4th at p. 531.) Although this case does not involve a buyer's breach of a written contract cause of action against a seller, the analysis in *Linden* is relevant here.

In this case, the tenant, not the seller, signed the estoppel certificate, attesting to the information contained therein. Paragraph 2 of the estoppel certificate provides: "The term of this Lease commenced on November 1, 1973 and will expire on October 31, 1998." Above the date and signatures on the certificate is the following statement: "The foregoing certification is made with the knowledge that Purchaser is about to purchase the Property, that Lender is about to fund a loan on the Property, and that

said parties are relying upon the representations herein made in making such purchase and funding said loan."

Plaintiff and defendant were both bound by the ground lease, as assignees of the original landlord and tenant. Article 38 of the ground lease provides, in relevant part: "The Tenant shall without charge at any time and on a reasonable number of occasions within ten (10) days after written request of Landlord certify by written instrument in recordable form duly executed and acknowledged to any . . . purchaser . . . as to the validity and force and effect of this Lease in accordance with its tenor, as to the existence of any default on the part of any party thereunder, as to the existence of any offsets, counterclaims or defenses thereto on the part of the Tenant and as to any other matters as may be reasonably requested by Landlord." Article 33 states that, "[a]ll of the provisions of this Lease shall bind and inure to the benefit of the parties hereto, and their respective legal representatives, heirs, successors and assigns." A reasonable interpretation of these provisions leads to the conclusion that defendant was required to provide a written instrument containing the above information, commonly referred to as an estoppel certificate. In signing and delivering the estoppel certificate, defendant is estopped from contradicting the facts, including the termination date, contained therein.

Generally, the commencement and termination dates are necessary components of a lease agreement. (See 6 Miller & Starr, Cal. Real Estate (2d ed. 1989) Landlord and Tenant, § 18:26, p. 57.) In this case, where the exact termination date was unknown, the estoppel certificate served to set forth the key terms of the lease agreement, as understood by the tenant at the time of plaintiff's purchase of the property.[10] Even if the estoppel certificate contains an erroneous recitation of the lease terms, the facts contained in the certificate are conclusively presumed to be true under section 622.[11]

■ Estoppel certificates are almost always used in commercial real estate transactions. They inform lenders and buyers of commercial property

---

[10]The facts in this case are clearly distinguishable from the facts in *Aspeitia v. California Trust Co.* (1958) 158 Cal.App.2d 150 [322 P.2d 265]. There, the court held that the signing and delivery of an offset statement did not give an otherwise invalid contract validity. (*Id.* at p. 155.) Rather, this case is similar to *Linden Partners*, where the seller was bound by the estoppel certificate, despite the erroneous recitation of the monthly rent. (*Linden Partners v. Wilshire Linden Associates, supra*, 62 Cal.App.4th at p. 531.)

[11]Notably, the court's finding that the termination date was on June 30, 1999, was also in error according to the terms of the ground lease. Under articles 2 and 11 of the ground lease, the commencement date occurred, at maximum, 10 months after execution of the ground lease. Thus, under article 2, the commencement date was *the earlier* of April 1, 1974, at the latest, or June 14, 1974, the date the bank opened. Clearly, the court was wrong in using the date the bank opened to determine the commencement date. Based on this faulty premise, the court concluded that the termination date was on June 30, 1999. Failure by the parties and the

of the tenant's understanding of the lease agreement. Lenders and buyers rely upon the certificates in finalizing loans and purchases. Thus, application of section 622 to estoppel certificates would promote certainty and reliability in commercial transactions. A contrary conclusion would defeat the purpose behind the widespread practice of using estoppel certificates.

■ For the reasons provided above, we hold that, under section 622, when a tenant signs and delivers an estoppel certificate, as required under the commercial lease agreement, that tenant is bound to the recitations of fact contained therein.[12] In this case, defendant is estopped from contradicting the termination date set forth in its estoppel certificate. Therefore, in failing to exercise its option to renew the ground lease within the one-year time period before the termination date of October 31, 1998, and in remaining on the premises after that date, defendant was guilty of unlawful detainer.

### 4. *Disposition*

We reverse the trial court's judgment that defendant was in lawful possession of the subject property. Based on this ruling, we also reverse the trial court's award of attorneys' fees. Plaintiff shall recover its costs on appeal.

Ramirez, P. J., and Richli, J., concurred.

---

court to determine the correct commencement and termination dates supports our conclusions that estoppel certificates provide reliability in commercial real estate transactions.

[12]Contrary to defendant's argument, when the conclusive presumption in section 622 applies, a party does not need to demonstrate detrimental reliance.